**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| COREY MOORE, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | No. 15 CV 10376 |
| | ) | |
| RANDY PFISTER. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Respondent. | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Corey Moore brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254 to challenge the convictions he received after two bench trials in the Circuit Court of Cook County, Illinois involving related murders. In the first trial, Moore was convicted of the first degree murder of his employer, Lonnie Williams, the attempted first degree murder of Lonnie's wife Melanie Williams, and armed robbery. In the second trial, he was convicted of the first degree murder and aggravated unlawful restraint of his girlfriend Kimberly Fort, who had provided information about the Williams murder to the police. At a combined sentencing hearing, the trial judge sentenced Moore to life imprisonment in the Williams case and to death in the Fort case. The death sentence was subsequently commuted to a term of life. Moore is serving these sentences at Stateville Correctional Center in Joliet, Illinois, and the Respondent in this case is Randy Pfister, Stateville's warden (hereafter, "the state"). Moore's petition identifies three claims in his § 2254 petition, each relating to both cases: (A) that he was denied due process because the state withheld impeachment evidence concerning a prosecutor who testified concerning Moore's confessions to the crimes; (B) that he was denied his right to counsel because the trial court limited the scope of Moore's post-conviction counsel's appointment; and (C) that his trial counsel rendered ineffective assistance by advising him to waive his rights to a

jury trial. For the reasons set forth in this Memorandum Opinion, Moore's petition, and his motion for an evidentiary hearing, are denied.

## I.    Background

Factual determinations made by state courts are presumed to be correct unless a petitioner offers "clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing § 2254(e)(1)). Moore's petition fails that requirement and so this Court derives the following facts from the record established in the state court proceedings. The Court takes these facts primarily from the opinion of the Illinois appellate court denying Moore's postconviction petition (Ex. I,[1] *People v. Moore,* 2014 IL App (1st) 123480-U (6th Div. Aug. 15, 2014)), the last state court that ruled on the merits of Moore's due process claim and from the opinions of the Illinois appellate courts in Moore's direct appeals, which were the last courts to address the merits of Moore's Sixth Amendment right to counsel claim and jury waiver claim (Ex. B; *People v. Moore,* 359 Ill. App. 3d 1195 (2005), No. 1-04-0766 June 21, 2005 (Williams case); and Ex. F, *People v. Moore,* 389 Ill. App. 3d 1031 (1st Dist. April 6, 2009) (Fort case)). *Frentz v. Brown*, 876 F.3d 285, 293 (7th Cir. 2017) ("The state court whose decision we review is the last one that ruled on the merits of the issue.").

To set the groundwork, it is undisputed that petitioner Moore shot and killed Lonnie Williams in a stairwell of his apartment building on September 3, 1996. Investigation of the Williams murder brought police to Moore's girlfriend, Kimberly Fort, who provided information identifying Moore and his possible whereabouts. About two months later, on November 21, 1996, Fort was murdered in front of the apartment building where she lived. Investigation of the

---

[1] References to lettered exhibits ("Ex.") are to the exhibit designations in the state court record supplied by the Respondent (ECF No. 20). Page references within those exhibits refer either to the internal pagination of the exhibit, or where the internal exhibit pagination is not consistent or clear, to the ECF pagination.

Fort murder also implicated Moore, who was arrested shortly thereafter in Atlanta, Georgia. Moore was charged separately for the Williams and Fort murders, and related crimes, in two cases: Case No. 97 CR 1779, for the Williams murder, and Case No. 97 CR 1780 for the Fort murder. In the Williams case, Moore's defense was predicated on the theory that he shot Williams in self-defense after Williams produced a gun during an argument the two were having over money that Williams owed him. Ex. T, Defense Opening Statement, Williams Trial, Tr. 3-22-99 at J-17 (describing struggle for gun produced by Williams resulting in Williams' being shot); Request for Evidentiary Hearing, ECF No. 23 at 4 n.2 ("Moore claim[ed] self-defense"). In the Fort case, Moore claimed that he was in Atlanta when Fort was murdered. Ex. V, Defense Opening Statement, Tr. 3-29-99 at N12:22 – N13:7. Ultimately, Moore was tried and convicted of these charges in separate bench trials, conducted back-to-back by the same trial judge, Cook County Circuit Judge James D. Egan, in the spring of 1999. A capital sentencing hearing encompassing both cases followed and Judge Egan sentenced Moore to life without parole in the Williams case and to death in the Fort case. The death sentence was commuted to life without parole by Illinois Governor George Ryan in January 2003.

### A. Pre-Trial Suppression Hearing

Before the trials, Moore moved in both cases to suppress statements he made to police, claiming that he had been physically and mentally coerced into making them. Ex. I at ¶ 6; Ex. Q, Amended Motion to Suppress Statements at 45-49; Ex. S, Tr. 6-30-98 at 52-115 and at 117-184. In particular, Moore alleged that Assistant State's Attorney Mike Rogers had coerced him to make statements by promising Moore that he would not receive the death penalty if he did so. Ex. I at ¶ 6. At a joint suppression hearing in both cases, ASA Rogers and Detective Andrew Abbott testified. *Id.* ¶ 7. Rogers told the court that he spoke with Moore on December 12, 1996, at the Area 3 police station at about 2 a.m. after giving Moore his *Miranda* warnings. *Id.* ¶ 9.

Rogers testified that he asked Moore about Lonnie Williams' murder, but that Moore denied being involved. *Id.* Rogers told Moore that Melanie Williams had implicated him and that Moore's cousin had tried to dispose of the same type of gun that had been used in Lonnie Williams' murder. *Id.* But Moore told Rogers he did not want to speak with him any further, and Rogers ended the interview. *Id.*

Abbott testified at the suppression hearing that he and Detective William Morrissette talked to Moore later that day at around 9:30 a.m. at the Area 2 police station. *Id.* ¶ 7. Abbott also advised Moore of his *Miranda* rights, and Abbott and Morrissette talked with Moore about Fort's murder. *Id.* Moore was placed in a lineup at around 11:30 a.m. that day, and at about 6 p.m., Abbott talked to him for a second time after again giving him his *Miranda* warnings. *Id.* Abbott testified at the suppression hearing that during these two talks, Moore did not ask to speak to a lawyer or to family members. *Id.* Abbott also denied that any officers physically assaulted Moore. *Id.* Rogers went to the Area 2 police station at about 6:30 p.m. that evening in connection with Fort's murder, and learned that Moore was in custody at that location. *Id.* ¶ 10. Rogers talked to Moore at about 6:45 p.m., again advising him of his *Miranda* rights. *Id.* Rogers then told Moore that he had been implicated in the murders of Lonnie Williams and Fort, and asked Moore if he would take responsibility for his actions. *Id.* Moore started to cry and said, "I did it. I killed them both." *Id.* Shortly thereafter, Moore provided two court-reported statements about the Williams and Fort murders.[2] Rogers asked Moore whether any promises or threats had been expressed to him in exchange for his statements, and Moore said that none had. *Id.* ¶ 11. Moore confirmed that he was allowed to use the bathroom and had also been provided food,

---

[2] The Court has not been able to locate the transcript of the statements themselves in the voluminous record, but the content of the statements was read into evidence at each of the trials. For the statement regarding the Williams trial, see Ex. U, Tr. 3-23-99, at K69 – K83. For the statement regarding the Fort trial, see Ex. W, Tr. 3-30-99, at O-99 – O-112.

drinks, and cigarettes. *Id.* At the hearing, Rogers denied threatening Moore or making him any promises. *Id.* The state trial court denied Moore's motion to suppress in both cases. *Id.*

The defense did not present any witnesses at the suppression hearing. *Id.* ¶ 13. In post-trial proceedings, Moore has asserted that he wanted to testify at the suppression hearing but was prevented from doing so by Carey. Moore maintains that he would have testified that his statements to Rogers were not voluntary but rather were the product of violent and coercive police interrogation and Rogers' promise that he would not receive the death penalty.

**B.      Jury Waivers**

As trial approached, Carey told the judge that after discussing the matter with Moore, "it looks like we are going to be waiving jury as to both cases both for trial and sentencing." Ex. T, Tr. 3-15-99, at I3. It does not appear that Moore was present in court for that statement, but the following week, on March 22, 1999, the state court engaged in the following discussion with Moore:

> **The Court:** Mr. Moore is present. At this juncture, it was indicated on the last date that we will be proceeding by way of bench; is that correct?
>
> **Mr. Carey:** That is correct, Judge. I have again explained to Mr. Moore the differences and the consequences of waiving his right to a jury, and he has executed a jury waiver for both cases, 1779 and 1780 as to trial phase and as to sentencing. We are ready to proceed at this time.
>
> **The Court:** Mr. Moore, I have been tendered, to start with, two jury waivers to two cases for trial. Is that your signature on the jury waiver forms?
>
> **Defendant Moore:** Yes.
>
> **The Court:** You understand you have a right to a jury trial, and do you understand what a jury trial is?
>
> **Defendant Moore:** Yes.

**The Court:** By signing these, you are giving up your right to jury trials, asking that I hear the evidence to determine whether you're guilty or not guilty. Do you understand that?

**Defendant Moore:** Yes.

**The Court:** I also have been tendered two waiver forms for the sentencing phase. If there is a finding of guilty on either of the two trials, you have a right to a jury to decide whether—if you were found eligible—you have a right to a jury deciding the sentencing phase. Did you understand that when you signed the waivers, you're giving up a right to a jury trial at sentencing phase when you signed these jury waivers? Do you understand that?

**Defendant Moore:** Yes.

**The Court:** And you signed one for each of the two cases?

**Defendant Moore:** Yes.

**The Court:** I believe, if I understand, we are proceeding with one case, and then to the next one?

**[Prosecutor]:** Yes, Judge.

**The Court:** Do you understand, Mr. Moore, the procedure we are going on? Has that been explained to you by your attorney?

**Defendant Moore:** Yes.

**The Court:** I will accept the jury waiver.

Ex. T, Tr. 3/22/99 at J3-4. As reflected in this colloquy, Moore signed written waivers of his right to a jury at trial and at sentencing for both cases. Ex. Q at 104-05 (trial and sentencing jury waiver forms in Case 1779); Ex. DD at C97-98 (trial and sentencing jury waiver forms in Case 1780).

On March 26, 1999, after the trial judge pronounced his verdict in the Williams trial and before the Fort trial began, he again asked Moore if he understood that he was still giving up his

rights to a jury in the Fort trial and in any death penalty stage that might result in the two cases. Ex. HH, Tr. 3/26/99, at 599-600. Moore again affirmed his understanding and waiver. *Id*.

C.    **Williams Trial**

At the Williams trial, Melanie Williams testified that she and her boyfriend, Lonnie Williams, had hired Moore in late July or early August 1996 as work as security for the Williams' Baskin-Robbins ice cream store. Rec. Ex. I. (Ill. App. Ct. Order in Postconviction Proceedings) ¶ 16. Three weeks later, Lonnie Williams fired Moore for repeatedly failing to show up for work. *Id*. Melanie Williams testified that on September 3, 1996, she and Lonnie Williams closed the store and drove home to their shared apartment, with Lonnie bringing a bag of money from the store's sales that week. *Id*. When they got home, Lonnie exited the car and walked to the front of their building. *Id*. ¶ 17. Melanie testified that she followed behind him, but that as she approached the building's front porch, Moore grabbed her, holding a semi-automatic gun. *Id*. ¶ 18. Melanie screamed, and Moore told her to be quiet before walking her up the stairs toward the second-floor apartment. *Id*. Lonnie then walked down the stairs and met Melanie and Moore in the stairwell, and Moore put the gun into Lonnie's stomach. *Id*. ¶¶ 18-19.

Melanie testified that Lonnie grabbed her and pushed her behind him, and that Moore demanded that Lonnie give Moore "the money." *Id*. ¶ 19. Lonnie handed Moore money from his back pocket, but Moore demanded more. *Id*. Lonnie then gave Moore the bag of money from the ice cream store, and Moore said, "You all shouldn't have done me like you did." *Id*. Melanie—who was still positioned behind Lonnie—then heard a gun go off. *Id*. Melanie testified that she ran upstairs into the apartment, and that Moore followed her in. *Id*. ¶ 20. Moore put the gun to Melanie's chest and pulled the trigger, but the gun did not fire. *Id*. After pulling the trigger two more times with the same result, Moore ran out the door and down the stairs. *Id*. The next day, Lonnie was pronounced dead from a gunshot wound to his face. *Id*. ¶ 21. On cross-examination,

Melanie denied that she had told police that she was actually inside the apartment when she heard Moore and Lonnie engaged in a struggle, followed by the sound of a gunshot. *Id.* ¶ 22.

Romero Prince lived two doors south from Lonnie and Melanie's apartment on the night of the killing, and testified that on the same evening he had heard a loud crack, like a gunshot, while he was sitting in his living room. *Id.* ¶ 23. He then saw Moore crossing in front of his (Prince's) building, walking from the north with a "rag" in one hand and a gun in the other, and then getting into a car and driving away. *Id.* Romero identified Moore at a police station lineup on December 11, 1996, after Moore had been extradited to Chicago from Atlanta, where he was arrested. *Id.*

Detective Mark Reiter testified that he was assigned to investigate Lonnie's shooting, and started looking for a person named Corey Porter after talking with Melanie; she and Lonnie had known Moore by that name. *Id.* ¶ 24. Reiter went to a townhouse where he spoke with Kimberly Fort, who gave him a photograph of Corey Porter and a possible address for that person. *Id.* Later, Reiter showed Fort and Melanie a digital photograph of Moore, and both women identified Moore as the person they knew as Corey Porter. *Id.* FBI Special Agent Michael Greene testified that he received information about Moore's potential whereabouts on December 2, 1996. *Id.* ¶ 25. Agent Greene arrested Moore in Atlanta, Georgia, and Moore—who had provided Greene with false identification (using his father's name) upon his arrest—was returned to Chicago on December 11, 1996. *Id.* ¶¶ 25-26.

Moore initially denied any involvement in the Lonnie Williams shooting or the robbery when talking with police in Chicago. *Id.* ASA Rogers testified at the trial that he then spoke with Moore at about 2 a.m. on December 12, 1996, at the Area 3 police station. *Id.* ¶ 27. After Rogers gave Moore his *Miranda* warnings and Moore said he understood them, Rogers asked Moore

what he knew about the shooting. *Id.* Moore said he had worked for Lonnie at the ice cream store and that Lonnie had "shorted" him some money, but Moore continued to deny that he shot Lonnie. *Id.* Rogers testified that he talked to Moore again at 6:30 p.m. that same day at the Area 2 police station, telling Moore that multiple people had connected him to the murders of both Lonnie Williams and Fort. *Id.* ¶ 28. Moore began to cry and said he had "killed them both." *Id.*

Moore's court-reported statement was read into evidence as well. In it, Moore said that he worked security in Lonnie's Baskin-Robbins store and also sold drugs for Lonnie. *Id.* ¶ 29. Moore related that he had sought out Lonnie on September 3, 1996, because Lonnie owed him $400 in back pay. *Id.* ¶ 30. According to Moore's statement, Moore yelled at Lonnie once Lonnie and Melanie arrived at their apartment building, and Lonnie invited Moore to come upstairs with them. *Id.* As Moore followed Lonnie and Melanie up the stairs, Moore pulled out a loaded gun that Lonnie had provided him for when he worked security at the store. *Id.* ¶ 31. Moore's statement said that when Moore told Lonnie he just wanted his money, Lonnie handed him a bag and said, "Here, take the money." *Id.* ¶¶ 31-31. Moore reached for the bag, and Melanie suddenly moved toward the apartment. *Id.* ¶ 32. Moore said in his statement that he moved toward Melanie, and then Lonnie grabbed Moore, and the two men engaged in a struggle in which Moore threw Lonnie off, Lonnie staggered down a few stairs, and Lonnie tackled Moore. *Id.* Moore said in his court-reported statement that he fell back and fired one shot with Lonnie on top of him, and that Lonnie then fell sideways. *Id.* Moore stated that he grabbed the bag of money and ran after Melanie into the apartment. *Id.* ¶ 33. According to the statement, Melanie grabbed Moore's arm and said, "Please don't," after which Moore pushed her off and ran down the stairs and out the building, with the gun in one hand and the bag in the other. *Id.* Moore

stated that he crossed the street, threw the gun in the park, and got in his cousin's car. *Id.* He

went to Atlanta with his father about a week and a half later. *Id.*

Moore called two witnesses in an effort to impeach Melanie's testimony regarding the

shooting. *Id.* ¶ 34. One police officer testified that when he spoke with Melanie at the scene, she

said that she had run into the apartment when Moore demanded the money from Lonnie, and that

she heard their physical struggle and the gunshot while she was inside. *Id.* A detective testified

that when he talked to Melanie at the hospital, she said she was inside her apartment when she

heard the struggle and the shot. *Id.*

At the conclusion of the bench trial, the state trial court convicted Moore of the first-

degree murder and armed robbery of Lonnie Williams and the attempted murder of Melanie

Williams. *Id.* ¶ 36.

### D.      Fort Trial

Moore also faced a bench trial on charges related to the killing of Kimberly Fort.

Detective Mark Reiter testified again regarding his assignment to investigate Lonnie Williams'

murder and his visit to speak with Fort about the possible whereabouts of Corey Porter. *Id.* ¶ 39.

After Reiter learned on September 4, 1996, that Corey Porter's real name was Corey Moore, he

showed Fort a digitally enhanced photograph of Moore. *Id.* An arrest warrant for Moore

followed. *Id.*

On the morning of November 20, 1996, Fort called Detective Patrick Harrington, who

was assigned to the FBI's Fugitive Task Force, to talk about Moore. *Id.* ¶ 40. Harrington testified

that after the call, he and two other FBI agents met with Fort, who was agitated and afraid. *Id.*

She talked to Harrington about Moore, and Harrington then drove Fort and two of her children to

their home. *Id.* The agents went into Fort's apartment to search for Moore, but Moore was not

there. *Id.* Harrington saw that there was fresh food on the stove, and that the television was on.

*Id.* Fort used Harrington's phone to call her building's management to ask that they change her locks, and Harrington gave Fort his business card. *Id.*

Synetta Smothers testified at the trial that she lived two houses away from Fort's residence, and that at about 9:00 a.m. on the morning of November 21, 1996, she was at home and heard someone screaming. *Id.* ¶ 41. Looking out her front door, Smothers saw Moore holding a shotgun and pulling Fort, who was crying, up the street. *Id.* Moore pulled Fort through the front gate to her home and told her to get in the house. *Id.* ¶ 42. Smothers went back inside her own home, and a few seconds later, heard a boom that she thought was the sound of a shotgun firing. *Id.* After a few minutes, Smothers went outside, where she saw Fort lying in a gangway, bleeding and gasping. *Id.* When the police arrived, they showed Smothers a photograph of Moore, whom Smothers identified as the person who had dragged Fort through the front gate. *Id.* ¶ 43. Smothers later picked Moore out of a lineup at the Area 2 police station on December 12, 1996. *Id.* She testified that she had never seen Moore before the day of Fort's murder, and denied telling Detective Abbott that she knew Moore and had seen him on several prior occasions. *Id.* ¶ 44. At trial, the parties stipulated that a police officer who completed a case report related to Fort's shooting spoke with Smothers, who had told him that she saw two men running away as Fort lay wounded. *Id.* ¶ 45.

Fort's downstairs neighbor, Katherine McGue, testified at the trial as well. McGue said that she knew Fort had a boyfriend, but had not seen him for at least three months by the time of Fort's murder. *Id.* ¶ 46. McGue testified that she was also at home on the morning of November 21, 1996, and that at 9:00 a.m. she heard a boom coming from her window. *Id.* ¶ 47. She looked out and saw Fort "full of blood" and lying in the gangway, and saw two people running toward the back gate. *Id.*

Detective Abbott also testified at the Fort trial. He was assigned to investigate Fort's death and arrived at her home at about 9:30 a.m. on the day of the shooting. *Id.* ¶ 49. At the scene, Abbott observed a pool of blood with two shotgun waddings in it, and also saw a blood-soaked towel. *Id.* At trial, the parties stipulated that a forensic scientist would testify that the wadding was a .12-guage shot and that the pellets he examined were of a size that could be fired from a .12-guage shotgun. *Id.* ¶ 59. Abbott went to the rear of Fort's apartment building and saw that the glass in the rear window of the second floor—where Fort lived—was broken, and that the window screen was partially torn away. *Id.* ¶ 50. Abbott entered Fort's apartment and found Harrington's business card and a photograph of Fort and a black male. *Id.* Abbott showed that photograph to Smothers, who identified the man in the photograph as a person she knew as Corey, who she had seen earlier that day. *Id.*

As he had at the Williams trial, ASA Rogers testified at the Fort trial regarding his questioning of Moore, and read into evidence Moore's December 13, 1996 court-reported statement regarding the Fort shooting. *Id.* ¶ 52. In that statement, Moore said that Fort was his girlfriend of four years and that he had walked home—to Fort's apartment—on the morning of Fort's killing with a .12-gauge, double barreled, sawed-off shotgun under his coat. *Id.* ¶ 53. Moore said he was armed because he was facing a death threat as a result of killing Lonnie Williams. *Id.* Moore stated that when he got home, he found that the lock had been changed, so he tried to enter the apartment through the safety bars on the back window. *Id.* ¶ 54. He said that Fort refused to open the door for him, locked the window, and told him that she did not want him in the house and was going to call the police. *Id.* Moore said that he lost his temper, broke the window with the barrel of his shotgun, saw Fort run toward the front of the house, and then chased her and caught up with her. *Id.* ¶ 55. According to Moore, he asked Fort why she was

scared, and she screamed his name in response and said, "Don't shoot me." *Id.* ¶ 56. Moore's gun was visible, and he told Fort to walk to the house. *Id.* Moore stated that he then realized that Fort must have implicated him in Lonnie Williams' murder. *Id.* ¶ 57. Moore said he shot Fort as she was walking about 10 feet in front of him. *Id.* According to Moore's statement, Moore ran away, threw the shotgun in the street, and went to his cousin's house. *Id.* ¶ 58. The next day, he went to Atlanta. *Id.* Fort died from multiple shotgun blasts. *Id.* ¶ 48.

Moore's father, Michael Jackson, testified for the defense, saying that he and Moore moved to Atlanta sometime in mid-September 1996. *Id.* ¶ 60. Jackson testified that he had no knowledge, however, that Moore had left Atlanta for a return visit to Chicago in November 1996, and said he did not know whether Moore had been in Atlanta or in Chicago on the day of Fort's murder. *Id.* ¶¶ 62-63.

At the conclusion of the Fort bench trial, the trial court convicted Moore of first-degree murder and aggravated unlawful restraint. *Id.* ¶ 64.

E.    **Sentencing**

At a combined capital sentencing hearing on July 1, 1999, the trial court found Moore to be eligible for the death penalty in both cases. The court then sentenced Moore to natural life without the possibility of parole in the Williams case and to death in the Fort case. Sentencing Order, Ex. R at 3-4; Exs. A, K. Subsequently, the sentence of death in the Fort case was commuted to natural life without the possibility of parole.[3] Ex. B. at 2 n.1; *People v. Moore*, 207 Ill. 2d 68 (2003) at 70. The court also sentenced Moore to two concurrent 30-year terms of

---

[3] The record does not appear to provide the detail regarding Moore's sentencing commutation, but the Court takes judicial notice that on January 12, 2003, Illinois Governor George Ryan commuted all death sentences for Illinois prisoners to terms of life or, in some cases, less than life terms. *See, e.g.*, https://www.nytimes.com/2003/01/12/us/citing-issue-of-fairness-governor-clears-out-death-row-in-illinois.html.

imprisonment for attempted murder and armed robbery in the Williams case and a 5-year term of imprisonment on the unlawful restraint charge. *People v. Moore*, 207 Ill. 2d 68, 75 (2003).

### F.     Post-Trial Motions

After sentencing, Moore's trial counsel moved for new trials in both cases, asserting a litany of some 61 errors that had occurred at the Moore trial and another 73 at the Fort trial. Ex. I at ¶ 67; Ex. Q at 114-21; Ex. DD at 113-22. Moore, however, also filed a *pro se* motion for appointment of counsel other than the public defender, claiming that his trial counsel had rendered ineffective assistance in both cases. Ex. Q at 111-13; Ex. DD at 128-130. The trial judge denied the motions filed by Moore's trial counsel and, rather than appoint new counsel to pursue Moore's claims of ineffective assistance advanced in his *pro se* motion, the judge appointed new counsel (from the State Appellate Defender's office) to represent Moore on appeal. Ex. I at ¶ 67; July 1, 1999 Docket Entry, Ex. Q at 5.

### G.     First Round of Direct Appeals

Because Moore was sentenced to death in the Fort case, his appeal in that case went directly to the Illinois Supreme Court. *People v. Moore*, 207 Ill.2d 68, 70 (2003); Ill. Const. 1970, art. VI, § 4(b); 720 ILCS 5/9-1(i). Moore appealed on a variety of grounds, including that the trial court erred in failing to consider his *pro se* post-trial motion for appointment of counsel to assist with his ineffective assistance claims.[4] On May 22, 2003, the state supreme court remanded the case for a hearing under *People v. Krankel*, 102 Ill.2d 181, 464 N.E.2d 1045 (1984), holding that the trial court erred in not conducting a preliminary examination of the underlying factual basis, if any, of the defendant's *pro se* post-trial claim of ineffective assistance of trial counsel. Ex. B, *People v. Moore*, 207 Ill. 2d 68, 75 (2003). The state Supreme Court

---

[4] Moore also raised sentencing issues, which the state Supreme Court deemed to be moot in view of the commutation of his sentence from death to life imprisonment.

remanded the case to the trial court for the required preliminary investigation. The Court expressly held that "[if] the trial court denies the motion, defendant may still appeal his assertion of ineffective assistance of counsel along with his other assignments of error." *Id.* at 81-82

Moore also filed a direct appeal in the Williams case, also asserting that the trial court erred in denying his post-trial motion for appointment of counsel to assist with his claims of ineffective assistance. Concluding that the state Supreme Court's reasoning was binding as to Moore's *pro se* post-trial motion in the Williams case, the Illinois Appellate Court followed suit and on June 17, 2003 remanded the Williams case for a *Krankel* hearing also. Ex. A.[5]

### H. Remand Proceedings

On remand, the trial judge held a joint hearing in both cases to determine whether counsel should be appointed with respect to Moore's ineffective assistance claims. Ex. , Tr. 11/18/03, ECF No. 1 at 79. Moore was given the opportunity to identify all of the grounds on which his claims were based. Most relevant to his current petition, Moore advised the court that Carey had assured him that if he waived his right to a jury trial in both cases and for both trial and sentencing, that the judge would not impose the death penalty:

> Okay. Jack Carey, you know — Jack Carey told me that if he waived a jury for both — that if I waived a jury for both my trial and sentencing hearing, the Judge would not impose the death penalty. Had I known — had I not been given that assurance from Mr. Carey, I would have insisted on a jury trial in both cases. * * * And Jack Carey stated that if I take a bench and lose, he was sure that the Judge wouldn't sentence me to death.

*Id.* at G-5:23 – G-6:8; G-13:12-14.

---

[5] The appellate court also considered Moore's only other contention in this appeal, namely that his convictions on knowing murder and felony murder should have merged with his conviction on the more culpable intentional murder conviction. Ex. A. at 3. The appellate court agreed and therefore vacated Moore's convictions for knowing and felony murder. That ruling has no bearing on the issues set forth in Moore's habeas petition.

Moore also claimed that Carey would not allow him to testify in support of the motion to suppress his statements. As to the suppression motion, he also asserted that Carey had failed to establish that he had invoked his right to counsel when facing extradition from Georgia and therefore should not have been interrogated by Chicago police when he arrived from Atlanta. With respect specifically to the Williams case, Moore asserted that Carey had failed to interview Donna Smith, a witness who lived in the same building as did the Williams. According to Moore, Smith told police that she had heard a struggle in the hallway, testimony that he contends would have supported his claim of self-defense and impeached Melanie Williams' account of Moore's attempt to shoot her. As to the Fort case, Moore complained that Carey had failed to interview alibi witnesses who would have placed him in Atlanta when Fort was killed, specifically Shirley Rivera, her daughter Lashawna, and Cynthia Mahogney, an employee of a motel where Moore was living at the time. He further maintained that Carey had failed to timely interview his father, allowing the prosecutors "to get to him first and to obtain a signed statement from him." ECF No. 1 at 82, Tr. 11/18/03 at G-8. Moore also alleged that a witness who police said had identified him in a lineup had actually identified another man in the lineup. Moore also identified a litany of instances in which he contended that Carey had failed to effectively cross-examine or impeach witnesses.

At a continuation of the hearing on 12/10/03, the judge heard testimony from Paul Coffey, who had second chaired Moore's defense in both cases. (Jack Carey, Moore's lead attorney, had passed away before the hearing.) Coffee joined the defense team about a year after Moore had been charged. He testified about work that had been done in preparing a motion to suppress Moore's statements in both cases, efforts made to try to locate witnesses, and to locate potential alibi witnesses in Atlanta. Coffey indicated that Carey had advised him that an "alibi

defense out of Atlanta is not going to work." ECF No. 1 at 110, Tr. 12/10/03 at I-10. Coffey testified that he met with Moore three or four times in lengthy sessions discussing the case and pretrial motion motions, but that Carey had most of the contact with Moore.

Coffey testified about all of Moore's contentions, but only those pertinent to understanding or resolving Moore's habeas claim are summarized here. As to Moore's jury waivers, Coffey testified that he and Carey had advised Moore to waive his right to jury trial "for all sorts of reasons," and identified two specifically. First, Coffey related, he and Carey felt that the process of selecting a "death-qualified" jury (also known as "*Witherspooning*" the jury; *see Witherspoon v. Illinois,* 319 U.S. 510 (1968)) comprising jurors who had acknowledged that they could, under some circumstances, impose the death penalty; as Coffey bluntly described it, "the difficulty in Whitherspooning the jury [is] having to set [*sic*; seat?] twelve people that are going to already say that they would be willing to kill someone." ECF No. 1 at 111, Tr. 12/10/03 at I-11.[6] Coffey also indicated that he and Carey believed that the brutality of the facts associated with the killings would affect jurors more than it would a seasoned trial judge. Coffey testified that "by the time we proceeded to the trials, it was my understanding that Corey had wanted to waive his right to a jury." *Id*. at I-12. He added that Moore never indicated, even after being found guilty in the Williams trial, that he did not want to waive his right to a jury trial in the Fort case. *Id*.

As to Moore's claim that Carey failed to contact an attorney who represented him in Atlanta during extradition proceedings following his arrest, Coffey did not know whether Carey had contacted the attorney, but recalled that he and Carey had concluded ultimately that an

---

[6] Carey filed a pretrial motion to preclude Witherspooning the jury at the guilt-innocence stage of the trial, which the trial court denied. Ex. T at H-24, ECF 20-7 at 49.

argument that his statements in Chicago should have been suppressed because he had invoked his right to remain silent during the extradition proceedings was not promising.

Coffey testified that Carey did make efforts to interview witnesses, but he did not specifically know whether Carey had contacted Donna Smith. Nor was Coffey able to say whether Carey had interviewed the potential alibi witnesses in Atlanta that Moore had identified. The only thing Coffey could recall was that Carey concluded that an alibi defense "was not going anywhere." *Id.* at I-15.

Moore declined the opportunity to question Coffey during the hearing. *Id.* at I-17; *People v. Moore*, 389 Ill. App. 3d at 1036. After Coffey's testimony, the court took the matter under advisement.

On December 18, 2003, the trial court concluded that none of Moore's ineffective assistance claims had potential merit, save one. The judge found Moore's claim that Carey had given him poor advice in assuring him that he would not be sentenced to death if he waived his jury rights lacked any potential merit, concluding "that is a trial [strategy] issue" and that Moore had expressly waived his jury rights in court. ECF No. 1 at 129, Tr. 12-18-03 at 7. The court similarly relied on its colloquy with Moore in rejecting Moore's claim that Carey forced him to waive his right to testify. As to the failure to take steps to suppress statements based on the appointment of counsel in the Atlanta extradition proceeding and Moore's invocation of his right to remain silent, the court noted that Carey had filed a motion to suppress based on that argument and that the court had denied it based on state case law holding that such an invocation of the right to remain silent would have to be renewed following extradition. The court also held that the testimony of Donna Smith in the Williams case would not have been material in light of the

clear and credible eyewitness testimony of Melanie Williams, so the failure to call Smith did not amount to ineffective assistance.

The court did, however, conclude that the appointment of counsel was warranted with respect to Moore's claim that Carey had failed to interview certain alibi witnesses, noting that the claim could not be rejected given Coffey's lack of knowledge concerning the issue. Accordingly, the court denied Moore's motion to appoint counsel in the Williams case but appointed counsel, Richard Kling, to represent Moore in the Fort case in connection with his *pro se* motion. *Id*. at 9.

Apropos to Moore's second claim in the instant petition, the scope of Kling's representation of Moore was a source of some dispute in the trial court. In appointing Kling, the trial judge indicated that the only claim Moore had asserted that had some merit was the alibi defense claim, but nevertheless indicated that Kling "can basically look into all of Mr. Carey's actions in that case. . . . I know the attorney who is appointed may look into other matters, but we'll see." *People v. Moore*, 389 Ill. App. 3d at 1036. When Kling first appeared before the judge, however, the trial judge appeared to backtrack somewhat, responding to the state's assertion that Kling had been appointed only to look into the alibi defense issue by stating, "That's basically what it is." *Id*.

After his appointment, Kling obtained access to Carey's files and other materials from Moore, and that he was looking into a number of additional issues. At a hearing on June 2, 2005, Kling responded to the state's protest that the scope of any discovery and hearing was to be limited to the alibi defense issue was premature, stating, "Judge, I think the easy answer is I will file whatever I am going to file. If you are not going to consider it, you will strike it. If you are going to consider it, consider it. I don't know at this juncture whether we need to reach the

issue." *Id.* at 1037. The trial judge then endorsed that view, stating: "we will find out what [Mr. Kling] is filing and if there are any objections and see what actually is being filed." *Id.*

Notwithstanding the trial court's endorsement of a broader view of his representation, at a hearing on May 9, 2006, Kling subsequently indicated that he would be limiting his evidentiary presentation to the alibi defense issue because "correctly or incorrectly, my understanding is that you ruled that I'm limited to only the ineffectiveness with respect to the alibi . . . ." *Id.*; ECF No. 1 at 275-76, Tr. 5-9-06 at MM5 – MM6. And at the outset of the evidentiary hearing on October 18, 2006, Kling stated that he was limiting his presentation to the alibi issue based on the trial court's prior ruling. Ex. I at ¶ 78; ECF No. 1 at 326-27, Tr. 10-18-06 at TT7 – TT8. At no time did Kling identify any other ineffective assistance claims that he believed warranted a hearing.

An evidentiary hearing, limited to the alibi claim, was held on October 18, 2006. The particulars of the evidence adduced regarding that claim are not germane, as the trial judge denied the ineffective assistance claim premised on the alleged failure to investigate the alibi defense and Moore did not appeal that ruling. Ex. F at 11-14; Ex. I at ¶ 82; *People v. Moore*, 389 Ill. App. 3d at 1039. Moore's habeas petition does not assert the denial of this ineffective assistance claim as a ground for relief.

### I.     Second Round of Direct Appeals

#### 1.     *The Williams Case Appeal*

Asserting that his post-trial motion had presented "several 'potentially meritorious' allegations" of Carey's ineffectiveness, in his second direct appeal in the Williams case Moore raised only the denial of his motion for appointment of counsel to assist him in connection with his *pro se* post-trial motion.[7] Ex. B at 8. More specifically, however, Moore asserted that three of

---

[7] Moore did not appeal the trial court's denial of the post-trial motion filed by his trial counsel or any other ruling made during the course of the Williams trial.

his *pro se* claims of ineffective assistance of trial counsel showed "possible neglect" of trial counsel and warranted the appointment of additional counsel by the trial court to investigate and present those claims in a motion for new trial. Ex. L, Appellant's Brief, at 17-18. These grounds included Moore's claim that Carey had coerced him to waive his jury rights, that Carey did not permit him to testify at a suppression hearing or at trial to support his claim that his statements to ASA Rogers were products of coercion, and that Carey had failed to interview Donna Smith. The appellate court found that these claims had no merit, did not warrant the appointment of new counsel by the trial court, and affirmed the trial court's judgment on June 21, 2005. Ex. B at 15. The appellate court also denied Moore's petition for rehearing. Ex. B at A-16; ECF No. 20-1 at 19.

Moore, represented by counsel, filed a petition for leave to appeal his conviction (PLA) in the Illinois Supreme Court. Critically, the PLA raised only the argument that the trial court had erred in denying Moore's motion to appoint new counsel to assist with his *pro se* post-trial ineffective assistance motion premised on Moore's waiver of his jury rights. Moore did not seek review of the rulings regarding the other two ineffective assistance arguments on which he had based the appeal of his conviction in the Williams case (that is, Carey's alleged refusal to permit him to testify or the failure to call Donna Smith as a witness). Exhibit C (direct appeal PLA in Williams case) at 2, 8-11. That PLA was denied on January 25, 2006. Exhibit D; *People v. Moore*, 217 Ill. 2d 617 (Table) (2006).

### 2. *The Fort Case Appeal*

Moore also appealed the trial court's post trial motion ruling in the Fort case, contending that the trial court had denied his right to counsel by limiting post-trial counsel's appointment to a single basis for ineffective assistance (namely, the failure to investigate an alibi defense

claim).[8] Ex. F at 14-27; *People v. Moore*, No. 1-07-0173, 389 Ill. App. 3d 1031, 1032 (1st Dist. 2009). In this appeal, Moore identified only a single additional claim as to which he maintained that counsel should have been appointed, that being an argument that Carey had failed to competently challenge the photograph and lineup identifications of Moore by witness Synetta Smothers. Ex. N.

The Illinois Appellate Court affirmed Moore's conviction in the Fort case on April 6, 2009, *id*. at 1046, and denied Moore's petition for rehearing on May 1, 2009. Ex. G at 1. The Illinois Supreme Court denied Moore's ensuing PLA, which alleged that the trial court denied petitioner his right to counsel when it limited post-trial counsel's appointment to a single basis for ineffective assistance, on September 30, 2009. Ex. G (direct appeal PLA in Fort case); Ex. H (order denying PLA in Fort case).

### J.      Postconviction Proceedings

While his two second round direct appeals were still pending, Moore filed in the Circuit Court of Cook County post-conviction petitions pursuant to 725 ILCS 5/122-1 et seq. *See* Ex. ZZ (postconviction supplemental record) at 2 (Fort postconviction petition filed pro se on November 30, 2000); *id*. at 18 (counsel files postconviction petition relating to both cases on July 1, 2002). The circuit court consolidated the cases and appointed counsel eventually filed an amended postconviction petition asserting a variety of claims. Two are relevant to the present petition.[9] The post-conviction petition alleged, as Moore had done in his appeal in the Williams case, that trial counsel was ineffective in both cases for convincing him to waive his jury rights. In the

---

[8] As noted *infra*, Moore did not appeal the trial court's substantive denial of his ineffective assistance claim based on Carey's alleged failure to adequately investigate an alibi defense. Nor did he appeal the denial of the post-trial motion filed by Carey or any other substantive rulings by the trial court during the Fort trial.

[9] Moore did not reassert his right to counsel claim in his post-conviction petition.

amended post-conviction petition, however, Moore's post-conviction counsel changed the premise of Moore's jury waiver claim; whereas previously Moore had complained that Carey had given him "wrong advice" in assuring him that he would not receive the death penalty if he was convicted and sentenced by the judge rather than a jury, in the amended petition Moore claimed that Carey had falsely represented that the judge had committed not to impose the death penalty if Moore waived his jury trial rights. Ex. I at ¶¶ 87-88; Ex. XX (PC CLR, vol. 1) at C83, C200-207.

In a supplemental petition, accepted by the post-conviction court and considered with the claims in the amended petition, Moore also asserted a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), alleging that he was denied due process in both cases when the prosecutor withheld evidence that ASA Rogers had previously been involved in taking false statements in a prior case. Ex. I at ¶¶ 25-28, 88; Exhibit YY (PC CLR, vol. 2) at C308-17.

The circuit court denied postconviction relief. Ex. I at ¶ 89; Ex. YY at C409-25. As to the jury waiver claim, the circuit court found the claim to be barred by *res judicata* because the trial court had addressed the issue in the context of the *Krankel* remand and the appellate court had affirmed Moore's conviction. With respect to the *Brady* claim, the circuit judge found that there was no basis to conclude that the evidence was not exculpatory: "the fact that Rogers approved charges against two other suspects, questioned by detectives not involved in the instant case … does not make it any more likely that petitioner's confession is false." Ex. YY at C417-18.

Moore appealed the postconviction court's ruling with respect to his jury right waiver ineffective assistance claim and the *Brady* violation claim. Ex. I at ¶¶ 96, 104; see also Ex. O

(postconviction appeal briefs).[10] The Appellate Court affirmed. Ex. I at ¶¶ 102, 108-09. Moore's

ensuing PLA in the Illinois Supreme Court sought review of only the *Brady* claim, however; he

did not seek review of the denial of his jury waiver claim. The Illinois Supreme Court denied the

PLA on November 26, 2014. Ex. J (postconviction PLA and order denying PLA) at 3, 64.

> ### K.     Federal Habeas Petition

On November 16, 2015, this Court received petitioner's timely pro se petition for a writ

of habeas corpus, asserting three grounds for relief. In his petition, Moore contends that:

> (A) In both cases, he was denied due process when the
> prosecutor withheld evidence that ASA Rogers had been involved
> in taking false statements in other cases, Doc. 1 at 10;
>
> (B) In the Fort case, the trial court denied petitioner's right
> to counsel when it limited post-trial counsel's appointment to a
> single basis for ineffective assistance, *id*. at 10-15; and
>
> (C) In both cases, trial counsel was ineffective for advising
> petitioner to waive his right to a jury trial, *id*. at 16-17.

The state concedes that the first two claims are not procedurally barred. With respect to

the jury waiver claim, however, it maintains that Moore failed to present that claim through one

full round of review in the state court with respect to the Fort case and so is procedurally barred

from obtaining habeas federal relief on that claim with respect to his conviction in the Fort case.

The state addresses the claim in the context of the Williams case on the merits.

> ## II.     Discussion

Moore's petition is governed by the Antiterrorism and Effective Death Penalty Act of

1996  ("AEDPA"), 28 U.S.C. § 2254. Under AEDPA, Moore must show that he is "in custody in

violation of the Constitution or laws or treaties of the United States" and that the last state court

---

[10] Moore also appealed the post-conviction court's denial of his ineffective assistance
claim premised on trial counsel's failure to call Moore as a witness at the hearing on his motion
to suppress his statements as involuntary. His habeas petition does not reassert that ground for
relief.

adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2554(a), (d)(1). The law under which the state court's decision is measured is "the law of the Supreme Court at the time of the last state court decision on the merits," meaning the law in August 2014 when the Illinois appellate court denied Moore's postconviction petition. *Goodman v. Bertrand*, 467 F.3d 1022, 1027 (7th Cir. 2006). To grant the petition, this Court must find that the state court's application of Supreme Court precedent was "objectively unreasonable" – that is, more than merely "incorrect or erroneous." *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003). This test is "highly deferential" and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Clearing § 2254(d)'s relitigation bar is meant to be a "difficult" undertaking, for federal habeas relief functions only to "guard against extreme malfunctions in the state criminal justice systems," *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (internal quotation marks and citation omitted), and "not as a means of error correction," *Greene v. Fisher*, 132 S. Ct. 38, 43 (2011) (citations omitted). Section 2254(d) thus places the burden on petitioner to show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. And even if Moore is able to prove a constitutional error, he must also demonstrate the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

A.    ***Brady* Violation Claim: Evidence that prosecutor was involved in other false statements**

Moore's first claim in this Court is that the State withheld evidence that, several years before taking his statements in this case, ASA Rogers had taken false statements from two

witnesses in an entirely unrelated case ("the Morgan case) in which those witnesses had falsely implicated a third individual in a sexual assault and murder. Under *Brady v. Maryland*, 373 U.S. 83 (1963), it is a violation of due process for the prosecution to withhold from the defense evidence that is exculpatory—that is, evidence that is both favorable and material. *Smith v. Cain*, 132 S. Ct. 627, 630 (2012). This includes evidence that tends to undermine a witness's credibility. *Weary v. Cain*, 136 S. Ct. 1002, 1006 (2016) (citing *Giglio v. United States*, 405 U.S. 150, 153-54 (1972)). Moore contends that information that Rogers had previously taken false statements should have been disclosed to him because it would have impeached Rogers' credibility in testifying about Moore's incriminating statements and the circumstances under which Moore made those statements.[11]

In rejecting this argument, the state postconviction appellate court correctly identified and applied *Brady*'s holding that it is a violation of a defendant's constitutional right to due process of law to fail to disclose evidence favorable to a defendant and material to guilt or punishment. Ex. I, ¶ 105. Further, the appellate court correctly noted that information is material under *Brady*'s rule when there is a reasonable probability that the result of the proceeding would have been different had the information been disclosed, which is to say that nondisclosed evidence undermines confidence in the outcome of the trial. *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017). There is no question, then, that the state court applied the correct legal standard.

---

[11] Moore's "traverse" (reply brief) to the Respondent's Answer (response brief) to the petition appears also to suggest that his *Brady* claim includes the withholding of evidence that Moore "was beaten, deprived of sleep, the bathroom & food prior to giving his coerced statement." ECF No. 24 at 6. But evidence of that (alleged) conduct was not, of course, withheld from Moore; he claims to have been the victim of that conduct. Information that is known to the defendant cannot be the subject of a *Brady* claim. *United States v. Agurs*, 427 U.S. 97, 103 (1976); *Long v. Pfister*, 874 F.3d 544, 549-50 (7th Cir. 2017) (*en banc*).

The state appellate court's application of the *Brady* standard was also plainly reasonable.

The state court explained its rejection of Moore's claim of a *Brady* violation as follows:

> Defendant contends that his supplemental postconviction petition made a substantial showing that the State committed a *Brady* violation by failing to disclose that in 1992, ASA Rogers had taken statements from Harold Hill (Hill) and Dan Young (Young), two suspects in the sexual assault and murder of Kathy Morgan, in which they implicated a third man, Pete Williams (Williams). The statements implicating Williams were false, as the State learned shortly thereafter (and prior to the cases against defendant here) that Williams was in jail at the time of the sexual assault and murder. Defendant argues that his supplemental postconviction petition made a substantial showing that ASA Rogers' prior taking of false statements from Hill and Young was material to defendant's guilt or punishment in Lonnie's and Kimberly's cases here; specifically, defendant contends that evidence of ASA Rogers' taking of the prior false statements from Hill and Young would have undermined ASA Rogers' credibility at defendant's suppression hearing and at the trials here, leading to the suppression of defendant's confessions and to his ultimate acquittal in each case.
>
> We disagree, because defendant acknowledges that there is no evidence of any wrongdoing by ASA Rogers in the taking of Hill's and Young's statements. In the absence of any wrongdoing by ASA Rogers in the taking of those statements, there is no reasonable probability that the result of the suppression hearing or either of defendant's trials would have been different had the State made the disclosure.

Ex. I at ¶¶ 106-07.

This reasoning is consistent with, not contrary to, the rule of *Brady* and its progeny. As the state court reasonably concluded, without evidence that ASA Rogers knew, at the time the statements in the Morgan case were taken, that those statements were false, information that those statements turned out to be false would do nothing to undermine Rogers' testimony about what Moore told him in this case or the circumstances bearing on the voluntariness of Moore's statements. The inference Moore would have sought to argue—that Rogers' testimony about statements Moore made in this case was not credible because statements he had taken in another

case were false—has probative force only if Rogers knew that the prior statements were false when Hill and Young made them. Moore, however, offers no such evidence and has conceded that "it has never been proved that Rogers was involved with any specific wrongdoing" in connection with the statements by Hill and Young. Appellant's Post-Conviction Brief on Appeal, ECF 20-3, at 43. In the absence of any evidence that Rogers knew the statements provided by Hill and Young were false when he took them, this information has no impeachment value whatsoever.

Moore speculates that because Rogers was "the common denominator" in the two false statements in the Morgan case, "one implication" is that Rogers suggested that the witnesses falsely implicate Williams in the crime. Reply at 9. This inference, he maintains, is bolstered by the allegations that Hill later made in a civil suit against Rogers and various police officers, to the effect that Rogers had fed the witnesses information to falsely implicate Williams in the murder. *See Hill v. Coppleson*, 627 F.3d 601, 603-04 (7th Cir. 2010). This speculation makes no sense in view of the prompt dismissal of the charges against Williams when it was learned that he was in custody on the day of Morgan's murder,[12] and in any event, these allegations were not made until years after Moore's trial (*see id*. at 603), so they could not have informed the state's assessment of materiality before and during Moore's prosecution.[13] At the time of Moore's trial,

---

[12] To the extent that there is any evidence of whether Rogers' knew that the statements provided by Hill and Young were false, it points in Rogers' favor. When it was discovered shortly after Hill and Young implicated Williams that Williams had been in jail on the date of Morgan's murder, the charges against Williams were dropped, a fact that suggests, if anything, that those involved in taking the statements from Hill and Young had not known that those witnesses were falsely implicating Williams when they made their statements. When that fact was discovered, prompt action was taken to remedy the problem. In short, there would have been no point in knowingly implicating someone known to have an ironclad alibi.

[13] Hill's allegations concerning Rogers were never substantiated; he dismissed his claims against Rogers after Rogers' unsuccessful appeal on immunity grounds and before trial. *See* Case No. 06 CV 6772, N.D. Ill., ECF No. 621.

the only information available to the state concerning Rogers' involvement in the Hill and Young statements was that Hill and Young had falsely implicated Williams in the murder. There was simply no information that Rogers knew that they had done so when he took the statements and the information therefore had no value as impeachment material. This undisclosed information, then, was irrelevant and therefore could not have been either exculpatory or material. *United States v. Cruz-Velasco*, 224 F.3d 654, 662 (7th Cir. 2000) ("irrelevant evidence cannot be material").

Even if this Court were of the view that information about ASA Rogers' involvement in taking the Hill and Young statements should have been disclosed because it had *some* impeachment value (and that is not this Court's view), that conclusion would not aid Moore's cause because this Court's review of the state court's rulings is highly deferential. Moore is entitled to habeas relief only if he establishes that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. But the state court's determination that the information was not material—that is, not sufficient to create a reasonable probability that the result of the proceeding would have been different had it been disclosed—cannot be said to have been so utterly without merit, given both the very limited (if not nonexistent) probative value of the information then available and the strength of the other evidence of Moore's guilt in both cases.

In that regard, the state postconviction appellate court further noted in its opinion:

> In so holding, we note that defendant's convictions here did not rest only on his confessions, but also on eyewitness testimony. Specifically, in Lonnie's case, Melanie testified to defendant's robbing and shooting of Lonnie. Melanie's testimony was corroborated by Romero's testimony to seeing defendant fleeing with a gun in his hand, as well as Special Agent Greene's

testimony regarding defendant's flight to Atlanta and his possession of false identification. In Kimberly's case, Synetta testified to seeing defendant dragging Kimberly through the gate in front of her house, after which she heard the gunshot blast and saw Kimberly lying bleeding in a gangway. Defendant's motive in murdering Kimberly was provided by the police testimony that Kimberly had been helping them with their investigation of defendant in Lonnie's murder. Given all this evidence against defendant in both Lonnie's case and Kimberly's case, there is no reasonable probability that the result of either case would have been different even if the State had disclosed ASA Rogers' participation (without any wrongdoing) in an unrelated case . . . .

Ex. I at ¶¶ 107. This detailed assessment of the evidence presented in the defendant's trials reasonably supports the appellate court's conclusion that there was no significant probability that the verdicts in the two trials would have been different had the information about Rogers' involvement in taking the false statements provided in the Morgan case been known to the defense.

It also bears noting in this regard that ASA Rogers' testimony was not the only evidence relevant to the question of whether Moore's testimony was coerced. *See, e.g., Snow v. Pfister*, 880 F.3d 857, 867-68 (7th Cir. 2018) (state court reasonably applied *Brady* in concluding, in light of other evidence corroborating witness statement, that failure to disclose evidence that the witness had been "coached" was not material). First, of course, were Moore's court-reported statements themselves, in which he confirmed that he had previously been advised of his rights and during which he was again read his Miranda rights and confirmed that he understood them but still wished to make the statements. Ex. U, ROA 1779, Tr. 3-23-99 at K69-70, ECF 20-8 at 69-70; Ex. W, Tr. 3-30-99 at O-100-01, ECF 20-10 at 100-01. *See also, e.g., United States v. Charles*, 476 F.3d 492, 497 (7th Cir. 2007) (*Miranda* warnings support finding of voluntariness). Moore also confirmed in his statements that he had not been coerced and had been treated "fairly" by the police, had been fed, permitted to smoke cigarettes, to use the restroom, and had

the opportunity to sleep. Ex U, Tr. 3-23-99 at K82-83, ECF 20-8 at 82-83; Ex. W, Tr. 3-30-99 at O-110–11, ECF 20-10 at 110-11.

In addition, Rogers was not the only witness to testify about Moore's confessions. Detective Andrew Abbott testified during the suppression hearing (Ex. R, Tr. 6-30-98, ECF No. 20-6 beginning at 73) and in the Fort trial (Ex W, Tr. 3-30-99 beginning at O-24, ECR No. 20-10 beginning at 24) that he learned that Moore was in custody at Area 2 headquarters when he arrived for work on the morning of December 12, 1996, having been transferred from Area 3 custody during the night. During the course of that day, Abbott conducted two interviews of Moore, each lasting between five and fifteen minutes, and neither produced any inculpatory statement by Moore. Abbott testified that Moore was advised of his Miranda rights before each interview, that Moore did not invoke his right to silence or to an attorney; that he was "relaxed" and coherent during the interviews; that he was not handcuffed in the interview room; that he was not assaulted, and that he was not denied sleep.

Detective Mark Reiter also testified at trial that he traveled to Atlanta and took Moore into custody on December 11, 1996 and transported him back to Chicago. After arriving at Area 3 headquarters at about 11:30 p.m. that evening, Moore was placed in a lineup in which Ponce identified him as the man he had seen with a gun leaving Williams' building on the night Williams was killed. Reiter also testified that he interviewed Moore at Area 3 with an Assistant State's Attorney and that Moore denied any involvement in the shooting or robbery of Lonnie Williams. Reiter also confirmed that Moore was given his Miranda warnings Ex U, Tr. 3-23-99 at K25, ECF 20-8 at 25.

Evidence that statements taken by Rogers in a case years earlier had proven to be false would have done nothing to impeach the testimony of Detectives Abbott and Reiter about the

circumstances of Moore's confessions. To the contrary, the testimony of those witnesses was consistent with that of Rogers. That Rogers' testimony was corroborated by witnesses who had nothing to do with the false statements taken in the Morgan case further diminishes the materiality of the allegedly impeaching information and demonstrates that the information was not reasonably likely to affect the verdicts the trial judge reached in this case.

Finally, the Court notes as well that Moore did not testify at either the suppression hearing or the trials, and his petition does not identify any other evidence to support an argument that his confessions were coerced. Moore maintains that Carey did not let him testify, but the Illinois courts rejected those claims (which are inconsistent with his express waivers of his right to testify at trial) and Moore has not reasserted that claim in his present petition. Moore, of course, had no obligation to testify, or to present any other evidence, at trial but the absence of any other evidence that would support an argument that his confession had been coerced confirms that information about false statements in the Morgan case was not reasonably likely to have changed the outcome of the trials.

In short, the Court concludes that there was no violation of due process arising from the state's failure to apprise Moore that statements Rogers had taken from suspects in the Morgan case turned out to be false. Accordingly, Moore's due process claim lacks merit and is denied.

### B.      Sixth Amendment Right-to-Counsel Claim: Limitation of Representation for Post-Trial Motions Based on Ineffective Assistance of Counsel

As his second ground for relief, Moore asserts that he was denied the right to assistance of counsel with respect to his *pro se* post-trial motions claiming ineffective assistance of counsel when the trial court appointed new counsel but limited that attorney to prosecuting Moore's claim that his trial attorney had rendered ineffective assistance by failing to adequately investigate Moore's alibi defense. Appointed counsel, Moore maintains, should have been

permitted to present additional issues as to his trial counsel's performance, such as failing to present evidence that Moore had invoked his right to remain silent during extradition proceedings in Atlanta and therefore should not have been questioned by police upon his arrival in Chicago, or that his confession had been coerced.[14]

The premise of Moore's argument is that he had a constitutional right to the assistance of additional counsel in filing post-trial motions alleging ineffective assistance of trial counsel. But there is no such right—or at least the Supreme Court has not issued an opinion that clearly establishes such a right. Under AEDPA, a federal court may grant habeas relief only when a state court's decision on the merits of a claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United States Supreme Court." 28 U.S.C. § 2254(d). "Clearly established Federal law," moreover, "includes only the

---

[14] Moore devotes the bulk of his reply brief on his habeas petition to arguing the merits of his claim that he should not have been interrogated after extradition to Chicago because he had been appointed counsel in Atlanta for his extradition proceeding and had invoked his right to remain silent at that hearing. That is not, however, the ground Moore identified for habeas relief; Ground Two of Moore's petition asserts that he was "deprived of his Constitutional Right to Counsel" when the trial court appointed new counsel to assist Moore with a claim that trial counsel had rendered ineffective assistance in failing to adequately investigate a potential alibi defense but did not allow that attorney to present other ineffective assistance claims that Moore had set forth in his post-trial *pro se* motion. As discussed *infra*, because there is no clearly established right under federal law to the assistance of additional counsel to present post-trial motions alleging ineffective assistance of trial counsel, it is not necessary to address Moore's substantive argument that his statements should have been suppressed based on events during the Atlanta extradition hearing.

Moore similarly maintains that Carey was ineffective with regard to the motion to suppress his statements because he did not permit Moore to testify in support of the argument that his confessions were involuntary because after arriving in Chicago on December 11, 1996 he had been physically abused and coerced, and had been promised that he would be spared the death penalty if he confessed. Again, however, the question presented by Ground Two is not whether Moore's trial counsel was ineffective in handling that issue but whether the trial court denied Moore's Sixth Amendment right to counsel by limiting the scope of inquiry of new counsel appointed to assist Moore with his pro se ineffective assistance claim regarding his alibi defense.

holdings, as opposed to the dicta, of [the Supreme Court's] decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014).

Thus, the "starting point" in considering a habeas claim "is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States, that governs the habeas" claim. *Marshall v. Rodgers*, 133 S. Ct. 1446, 1449 (2013); *see also, e.g., Yarborough v. Alvarado*, 541 U.S. 652, 660 (2004) ("We begin by determining the relevant clearly established law."). As the state notes, the Supreme Court has never held that a criminal defendant has a right to counsel in connection with the filing of a post-trial motion alleging ineffective assistance of trial counsel. Neither Moore's petition nor his reply brief identifies any such case and this Court is aware of none. In rejecting Moore's appellate argument in the Fort case regarding the scope of Kling's representation, the Illinois appellate court noted that "no case has addressed this precise legal issue," *Moore*, 389 Ill. App. 3d at 1040, and Moore himself conceded on direct appeal, and in his petition for leave to appeal to the Illinois Supreme Court, that counsel's "research has revealed no cases which deal with the scope of representation either *required by,* or *permitted to,* counsel appointed to assist a defendant who files a *pro se* post-trial motion alleging ineffective assistance of trial counsel." Appellant's Brief, Ex. N at 27, ECF No. 20-3 at 231; PLA, Ex. G at 15, ECF No. 20-2 at 16.

The Supreme Court itself has implicitly acknowledged that its precedents have ***not*** clearly established such a right. In *Marshall v. Rodgers*, the Supreme Court reversed the Ninth Circuit's grant of a habeas petition where the state appellate court had determined that the petitioner's right to counsel had not been violated by the trial court's denial of his request for counsel to assist with the filing of a post-trial motion, where the petitioner had waived his right to counsel on three prior occasions during the course of the trial. 569 U.S. at 59-60. In so

holding, the Supreme Court "assumed, ***without so holding***," that "after a defendant's valid waiver of his right to trial counsel under *Faretta*, a post-trial, preappeal motion for a new trial is a critical stage of the prosecution." 569 U.S. at 61 (emphasis added). The Court elected to make this assumption in order to address "the tension between the Sixth Amendment's guarantee of the right to counsel at all critical stages of the criminal process, and its concurrent promise of a constitutional right to proceed without counsel when a criminal defendant voluntarily and intelligently elects to do so." *Id.* at 63. The assumption suggests no view as to the merits of the critical stage issue and, in assuming an answer to the question for the sake of argument, the Court implicitly confirmed that the answer is not clearly established by its precedents—if it were, there would have been no need to assume the answer in order to advance the analysis. *White*, 134 S. Ct. at 1705 ("we are, after all, hardly in the habit of reserving separate questions that have already been definitively answered") (internal punctuation and citation omitted).

Further, the Supreme Court has said that states commit no impropriety even when they bar defendants from asserting claims of ineffective assistance of trial counsel except on collateral review. *See Martinez v. Ryan*, 566 U.S. 1, 13 (2012) ("This is not to imply the State acted with any impropriety by reserving the claim of ineffective assistance for a collateral proceeding). In *Martinez*, and in *Trevino v. Thaler*, 569 U.S. 413 (2013), the Court held that ineffective assistance by a prisoner's state postconviction counsel may qualify as cause to overcome the procedural default of failing to present an ineffective assistance of trial counsel claim, but only where "the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal." *Davila v. Davis*, 137 S. Ct. 2058, 2062-63 (2017). A substantial premise of the Court's holding was that "a trial court ordinarily will not have the opportunity to rule" on a claim based on an attorney's performance at trial, *Davila*, 137 S. Ct. at

2067, a view that is fundamentally at odds with Moore's premise that the opportunity to present ineffective assistance claims constitutes a critical stage of the trial proceeding itself. In *Martinez* and *Thaler*, moreover, the Court expressly left open the question of whether there is a Sixth Amendment right to counsel in connection with proceedings at which state collateral review is the first place a prisoner can present an ineffective assistance claim. *See Martinez*, 566 U.S. at 8-9. That exercise of restraint provides no basis to infer that the Court has ever recognized a right to counsel at an even earlier stage in the process of litigating an ineffective assistance of trial counsel claim.

It does not aid Moore's cause to assess the state of the law at a higher level of generality. The Supreme Court has, to be sure, held that criminal defendants have a right to counsel at every "critical stage" of a prosecution. *Iowa v. Tovar*, 541 U.S. 77, 80-81 (2004). But that is a far cry from holding that there is a clearly established right to the assistance of counsel with respect to the filing of post-trial motions for ineffective assistance during the trial.[15] A "critical stage" of a criminal prosecution is one that holds "significant consequences for the accused," *Bell v. Cone*, 535 U.S. 685, 696 (2002), and the Court has never held that the filing of a post-trial motion in the trial court, prior to a direct appeal, satisfies that criterion. And because there is no Supreme Court case that confronts "the specific question presented" by Moore's claim, the state appellate court's rejection of that claim cannot be "contrary to clearly established Federal law." *Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015). *See also, e.g., Knowles v. Mirzayance*, 556 U.S. 111, 122

---

[15] Moore's counsel on his second direct appeal essentially conceded that Moore's post-trial motion for new counsel to assist with ineffective assistance claims was not a "critical stage" of the prosecution by acknowledging that "a trial court possesses substantial discretion in deciding whether it is necessary to appoint new counsel when a defendant files a *pro se* motion asserting his trial lawyer's ineffectiveness." Appellant's Brief, Ex. L, at 17, ECF No. 20-2 at 253. If that were a "critical stage" of the proceeding, the decision as to whether to appoint new counsel would not be discretionary.

(2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court.") (internal quotation marks omitted); *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (where Supreme Court cases "give no clear answer to the question presented, let alone one in [the petitioner's] favor," it cannot be said that the state court unreasonably applied Supreme Court precedent and "relief is unauthorized"); *Long v. Pfister*, 874 F.3d 544, 549 (7th Cir. 2017) ("The Justices insist that a principle be made concretely applicable to the problem at hand before it may be used on collateral review.").

The Supreme Court's unanimous opinion in *Woods* makes plain that there is no "clearly established Federal law" where there is no Supreme Court precedent squarely addressing whether a particular stage of a criminal trial constitutes a "critical stage" of the proceeding. In *Woods,* the Court addressed the question of whether there was clearly established Federal law holding as to whether a particular part of a criminal trial constituted a "critical stage" in the proceeding. In *United States v. Cronic*, 466 U.S. 648 (1984), the Court noted, it held "that courts may presume that a defendant has suffered unconstitutional prejudice if he is denied counsel at a critical stage of his trial," and in *Woods* the question was whether *Cronic*'s presumption of prejudice applied when the petitioner's counsel had been absent from trial during the testimony of a government witness which was directly relevant only to codefendants at trial but which had also been admitted against the petitioner because he was being tried on aiding-and-abetting and felony murder theories. The Supreme Court held that the presentation of that testimony was not a "critical stage" in the trial as to the petitioner, and that the Ninth Circuit had erred in holding that it was, in the absence of any prior holding by the Court "confront[ing] . . . the specific question presented by this case." The Court expressly rejected the Ninth Circuit's reasoning that "the

testimony of a government witness is similar to the trial events that [the Supreme Court] has deemed to be critical stages," noting that "if the circumstances of a case are only 'similar to' our precedents, then the state court's decision is not 'contrary to' the holdings in those cases." *Id*. at 1377.[16]

It would be difficult to find a rule more general in its expression than "an accused has the right to counsel at all critical stages of the prosecution." As the Supreme Court has observed, the assessment of the right to counsel in connection with particular proceedings in the course of a criminal prosecution depends on the character of the proceeding in question. *See Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 212 (2008) ("what makes a stage critical is what shows the need for counsel's presence"). The application of such a general standard in the context of specific facts relevant to a particular stage in a particular criminal proceeding "can demand a substantial element of judgment." *Dassey v. Dittmann*, 877 F.3d 297, 303 (7th Cir. 2017) (*en*

---

[16] *Lopez v. Smith*, 135 S. Ct. 1 (2014) also illustrates the Court's insistence that appellate court holdings applying abstract general principles in specific contexts do not suffice as "clearly established" federal law for purposes of habeas review. In *Lopez*, the Court refused to deem clearly established the principle that a prosecutor must identify the specific theory of liability on which it would rely at trial, notwithstanding the general and well-established proposition that a defendant must have adequate notice of the charges against him. That general proposition, the Court declared, "is far too abstract to establish clearly the specific rule respondent needs. We have before cautioned the lower courts ... against framing our precedents at such a high level of generality." *Id*. at 4 (internal quotation marks omitted).

To the same effect is the Seventh Circuit's non-precedential decision in *Graham v. Pfister*, 614 Fed. App'x 847 (7th Cir. 2015). There, relying on the Supreme Court's instruction in *Woodall* and *Donald*, the court of appeals rejected the petitioner's argument that the right to counsel of one's choice was infringed by the trial court's endorsement of trial counsel's skill because the petitioner failed to "direct us to any holding of the Supreme Court establishing that a court infringes on a defendant's ability to retain counsel of his choosing when, in the face of hesitation on the part of the defendant, it endorses a lawyer's skill. *Id*. at 851. The court of appeals rejected the petitioner's invocation of precedent finding violations of the Sixth Amendment where trial courts arbitrarily denied pretrial continuances and thereby effectively denied defendants their counsel of choice because a rule that requires extension of existing Supreme Court holdings to a new factual scenario cannot be said to be clearly established. *Id*.

*banc*) (quoting *Alvarado,* 541 U.S. at 664). For that reason, it would be particularly difficult for the Court to map "the precise contours" of the right to the assistance of counsel at trial. *White*, 134 S. Ct. at 1705. The Supreme Court's right-to-counsel jurisprudence, in which it has evaluated whether the right to counsel attaches to proceedings in the course of a prosecution on a case-by-case (or stage-by-stage) basis, reflects the need for such individualized assessments.[17]

But although the Court has considered whether defendants have a sixth amendment right to counsel in a variety of contexts, it has never assessed whether the filing of a post-trial, pre-appeal, new trial motions premised on ineffective assistance of trial counsel constitutes a "critical stage" of a criminal prosecution. And under AEDPA, this Court is not free to extend the Court's "critical stage" jurisprudence to a new context.[18] Law that must be extended from one context to another is not clearly established. *Woodall,* 134 S. Ct. at 1706.

---

[17] The Supreme Court has had occasion to hold that a number of specific proceedings during the course of a criminal prosecution constitute "critical stages" of the prosecution. *See, e.g., Estelle v. Smith*, 451 U.S. 454, 471 (1981) (psychiatric interview); *Argersinger v. Hamlin*, 407 U.S. 25, 34 (1972) (entry of guilty plea); *Mempa v. Rhay*, 389 U.S. 128, 134-35 (1967) (sentencing); *United States v. Wade*, 388 U.S. 218, 227-28 (1967) (pre-trial lineup); *Massiah v. United States*, 377 U.S. 201, 205 (1964) (post-indictment interrogation); *White v. Maryland*, 373 U.S. 59, 60 (1963) (preliminary hearing); *Douglas v. California*, 372 U.S. 353, 358 (1963) (direct appeals of right); *Hamilton v. Alabama*, 368 U.S. 52, 52-55 (1961) (arraignment). Other proceedings have been deemed not to be critical stages of the prosecution. *See, e.g., Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) (testimony of government witnesses that is not contested); *Pennsylvania v. Finley*, 481 U.S. 551 (1987) (discretionary appeals); *Gerstain v. Pugh*, 420 U.S. 103, 122-123 (1975) (probable cause hearings); *U.S. v. Ash*, 413 U.S. 300, 325 (1973) (photographic display).

[18] That there are arguments to be made for extending the right to counsel to the post-trial motion stage is, of course, also irrelevant to the AEDPA analysis. Examples of such arguments include Jona Goldschmidt, *Has He "Made His Bed, and Now Must Lie in It"? Toward Recognition of the Pro Se Defendant's Sixth Amendment Right to Post-Trial Readmonishment of the Right to Counsel*, 8 DEPAUL J. FOR SOC. JUST. 287 (Spring 2015) (favoring requirement to readmonish criminal defendants of right to counsel in post-trial motion proceedings when they have previously waived right to counsel); Jonathan G. Neal, *"Critical Stage": Extending the Right to Counsel to the Motion for New Trial Phase*, 45 WM. & MARY L. REV. 783, 784 (2003) ("a logical extension of prior Supreme Court precedent on the reach of the Sixth Amendment

In the absence of a specific holding by the Supreme Court that post-trial, pre-appeal motions alleging ineffective assistance of trial counsel constitute a "critical stage" of a criminal prosecution, Moore's argument fails under AEDPA. It would fail as well even were it appropriate to evaluate his claim under the broad general "critical stage" rule, because as the Supreme Court explained in *Wood*, "where the precise contours of a right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." 135 S. Ct. at 1377) (internal quotation marks omitted). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 664. Given the high level of generality and abstraction inherent in the "critical stage" rule, the discretion to be afforded state courts in recognizing—or not recognizing—a right to counsel in connection with *pro se* post-trial pre-appeal new trial motions premised on ineffective assistance at trial is close to, if not at, its zenith.

Here, fair-minded jurists could reasonably conclude that the opportunity to file a pre-appeal motion for a new trial premised on ineffective assistance of trial counsel did not represent a "critical stage" in Moore's Illinois prosecution. Moore's substantial rights were not at stake in his *pro se* motion, particularly in view of the Illinois common law procedures that substantially mitigate any risk that asserting an ineffective assistance claim *pro se* will prejudice a criminal defendant's ability to prevail on such a claim. In Illinois, "[a] pro se posttrial claim alleging ineffective assistance of counsel is governed by the common-law procedure developed from [the state Supreme Court's] decision in *People v. Krankel*, 102 Ill.2d 181, 80 Ill. Dec. 62, 464 N.E.2d 1045 (1984), and its progeny." *People v. Ayres*, 2017 IL 120071, ¶ 1. As most recently summarized by the Illinois Supreme Court in *Ayres*, the *Krankel* procedure affords substantial

---

right to counsel and the reach of the Due Process and Equal Protection Clauses in related contexts does in fact compel coverage for this stage of the prosecution").

process and assistance to *pro se* criminal defendants alleging that their trial counsel was ineffective:

> The common-law procedure . . . is triggered when a defendant raises a pro se posttrial claim of ineffective assistance of trial counsel. . . . A pro se defendant is not required to do any more than bring his or her claim to the trial court's attention, and thus, a defendant is not required to file a written motion but may raise the issue orally or through a letter or note to the court. However, the trial court is not required to automatically appoint new counsel when a defendant raises such a claim. Rather, the law requires the trial court to conduct some type of inquiry into the underlying factual basis, if any, of a defendant's pro se posttrial claim of ineffective assistance of counsel. Specifically, the trial court must conduct an adequate inquiry, that is, inquiry sufficient to determine the factual basis of the claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the pro se motion. However, if the allegations show possible neglect of the case, new counsel should be appointed.
>
> In making the inquiry, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim. Accordingly, the trial court is permitted to inquire of trial counsel about the defendant's allegations. Likewise, the court is permitted to discuss the allegations with defendant. Lastly, the trial court is permitted to make its determination based on its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations.

*Ayres*, 2017 IL 120071, ¶¶ 11-12 (internal citations, quotation marks, and punctuation omitted). The court's evaluation, moreover, is not part of the adversarial process; the state does not participate in the identification of any ineffective assistance claims that merit the appointment of new counsel. *Jolly*, 25 N.E.3d at 108-10.

This is precisely the process employed in Moore's cases. After the trial court inquired of Moore about his claims, questioned trial counsel, and offered its own credibility assessments, the trial judge appointed counsel for the one claim that it concluded might have merit (the claim that

Carey failed to adequately investigate Moore's alibi defense), and determined that the remaining claims of ineffective assistance did not warrant the appointment of counsel because they lacked merit or involved matters of trial strategy.

This process did not put Moore's rights at risk. To the extent that his motion for new counsel was granted (as it was here in part), Moore obtained the benefit of the assistance of counsel in presenting at least one of his ineffective assistance claims. And to the extent that his *pro se* motion was denied, Moore lost nothing; his ineffective assistance claims were preserved and could have been reasserted on appeal. *See Moore*, 207 Ill. 2d at 81-81 ("If the trial court denies the motion, defendant may still appeal his assertion of ineffective assistance of counsel along with his other assignments of error."). And, in fact, Moore did raise several of his ineffective assistance claims on appeal. He did not, however, appeal the trial court's substantive rejection of his ineffective assistance claim based on his alibi defense, the claim as to which the trial court had appointed additional counsel for Moore.

Nor did Moore risk waiving an ineffective assistance claim by failing to identify it in his post-trial motion.[19] No formal motion is even required by the *Krankel* procedure, so a defendant needn't provide an exhaustive list of grievances against trial counsel to trigger the trial court's duty to review the claim; it is enough to make a "bare allegation of ineffective assistance." *Ayres*, 2017 IL 120071, ¶ 14 (rejecting argument that a pro se defendant alleging ineffective assistance of trial counsel must expressly allege "that he received ineffective assistance because of a

---

[19] Moore has not claimed that he failed to identify potentially meritorious ineffective assistance claims in his post-trial motion because he did not have counsel. Rather, he argues that counsel should have been appointed to assist him with other claims that he had already identified.

particular action that counsel took or neglected to take.").[20] Then, "[b]y initially evaluating the defendant's claims in a preliminary *Krankel* inquiry, the circuit court will create the necessary record for any claims raised on appeal." *Jolly*, 2014 IL 117142, ¶ 29. Indeed, "the primary purpose of the preliminary inquiry is to flesh out [the defendant's] claim of ineffective assistance . . . ." *Ayres*, 2017 IL 120071, ¶ 20.

There is no Supreme Court precedent that suggests, much less holds, that the procedures Illinois has adopted for evaluating post-trial pre-appeal new trial motions (or like procedures adopted by any other state) deprives a criminal defendant of his Sixth Amendment right to counsel. Moore points out and the state acknowledges that in *Johnston v. Mizell*, 912 F.2d 172 (7th Cir. 1990), the Seventh Circuit held that under Illinois law, a post-trial motion for a new trial constituted a critical stage in state prosecutions. *Johnston* does not help Moore, however, because it was decided in 1990, years before AEDPA was enacted, rendering holdings by the courts of appeals irrelevant in defining "clearly established Federal law."[21] It simply does not matter that several of the circuit courts of appeals have held that the filing of post-trial ineffective assistance motions constitutes a critical stage;[22] courts "may not canvass circuit decisions to

---

[20] Moore's PLA his conviction in the Fort case concedes that there is no risk of waiver associated with a *pro se* claim of ineffective assistance in a post-trial motion: "had appointed post-conviction counsel chosen to pursue claims of ineffective assistance not even contained in his or her client's *pro se* post-conviction petition, counsel would have had the discretion to do that"). Ex. G at 5, ECF No. 20-2 at 6.

[21] Circuit precedent is not completely irrelevant to the assessment of whether a particular point is "clearly established Federal law." A court may look to Circuit precedent to the extent that it addresses whether Supreme Court precedents clearly establish a particular proposition. *Marshall*, 569 F.3d at 64. The Seventh Circuit has not addressed the question of whether it is clearly established by Supreme Court precedent that the Sixth Amendment right to counsel applies to the filing of a post-trial pre-appeal new trial motion.

[22] *See, e.g., McAfee v. Thaler,* 630 F.3d 383, 393 (5th Cir. 2011) (motion for new trial premised on ineffective assistance constitutes "critical stage" of a Texas prosecution); *Williams v. Turpin*, 87 F.3d 1204, 1210 & n. 5 (11th Cir.1996) (motion for new trial is critical stage of Georgia proceeding); *Robinson v. Norris*, 60 F.3d 457, 460 (8th Cir. 1995) (Arkansas defendant

determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to [the Supreme Court] be accepted as correct." *Marshall,* 569 U.S. at 64. Under AEDPA, "[c]ircuit precedent cannot refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced." *Lopez*, 135 S. Ct. at 4.[23]

There is, in short, no "clearly established Federal law" affirming that the Sixth Amendment right to counsel requires the appointment of counsel to assist a defendant with a post-trial, pre-appeal new trial motion and Moore's claim fails for that reason alone. But even applying a more general standard that is clearly established—namely, that there is a right to counsel at all critical stages of a trial—it is reasonable to conclude that the assertion of post-trial ineffective assistance claims is not a "critical stage" of a criminal prosecution in Illinois in view of the procedural protections that Illinois provides to defendants making ineffective assistance claims.[24] Accordingly, Moore's request for relief based on his claim that the state court violated

---

had a right to counsel on a motion for new trial to raise ineffective-assistance claim); *Menefield v. Borg*, 881 F.2d 696, 699 (9th Cir.1989) (holding that there is a right to counsel, in California, on a post-trial, pre-appeal motion for new trial).

[23] In *Kitchen v. United States*, 227 F.3d 1014, 1018-19 (7th Cir. 2000) (per curiam), the Seventh Circuit reviewed the denial of a motion pursuant to 28 U.S.C. § 2255 and held that there is a Sixth Amendment right to counsel for the filing of a post-trial motion asserting that counsel was ineffective in failing to file a notice of appeal. Though post-AEDPA, *Kitchen* does not control here, as it was not a petition under § 2254 to which AEDPA applies, and because circuit precedent is not considered under AEDPA in any event when assessing whether there is "clearly established Federal law" on a point.

[24] Though not directly relevant to the determination of whether there is clearly established federal law providing a right to counsel to investigate pro se post-trial, pre-appeal, motions alleging ineffective assistance of trial counsel, the practical consequence of recognizing such a right warrants acknowledgment. To recognize such a right would be to require the appointment of an ombudsman attorney to review the pre-trial and trial record in nearly every criminal case (how many convicted defendants concede the effectiveness of their lawyers at trial?) to assess whether there may be a viable claim for ineffective assistance.

his Sixth Amendment right to counsel by denying him counsel to advance claims of ineffective assistance other than the claim relating to his alibi defense is denied.

## C.    Jury Trial Waivers

For his third ground of relief, Moore asserts that his trial counsel was ineffective in both cases for coercing him to waive his right to a jury trial.[25] According to Moore, he agreed to waive his jury trial rights in both cases because his trial counsel convinced him that the judge would not receive the death penalty if he did so. As to the Williams case, the state addresses the merits. As to the Fort case, the state maintains that Moore's claim is procedurally barred.

### *1.    Fort case procedural default*

A federal court may not review a state prisoner's habeas claim unless the prisoner has exhausted state remedies by fairly presenting the claim to the state courts for one full round of review. 28 U.S.C. § 2254(b)(1)(A); *Coleman v. Thompson*, 501 U.S. 722, 731–32 (1991). "This includes presenting the claims to the state's highest court in a petition for discretionary review." *Hicks v. Hepp*, 871 F.3d 513, 530 (7th Cir. 2017) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838,

---

[25] Moore's claim is limited to the waiver of his right to jury trials; he acknowledges that the has no claim with respect to the waiver of his jury rights at sentencing because his attorneys had "a rational, strategic basis for advising Mr. Moore to waive his right to a jury capital sentencing hearing." Petition (continuation sheet from Page 6), ECF No. 1 at 17. Further, any claim relating to the sentencing hearing is moot in any event because the trial court did not impose the death penalty in the Williams case and the death sentence imposed in the Fort case was subsequently commuted. Moore's constitutional right to a jury at sentencing was limited to consideration of facts necessary to impose a sentence of death. Although "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death," *Hurst v. Fla.*, 136 S. Ct. 616, 619 (2016), there is otherwise no Sixth Amendment right to jury participation in determining the sentence to be imposed following a conviction. By statute, however, an Illinois defendant "is entitled to have a jury decide whether the death penalty should be imposed." *People v. Mack*, 167 Ill. 2d 525,535 (1995). Under the Illinois statute, 720 ILCS 5/9-1, a defendant may waive his right to a jury determination as to the imposition of the death penalty, but the court sentences the defendant if jury rejects death penalty. *Id.* at § 9-1(g)). As Moore is no longer facing a death sentence, he has no claim for relief based on waiver of his right to a jury at the sentencing hearing; a jury would have had no power to impose a sentence any lower than the sentence Moore is now serving.

848). Failure to exhaust is a procedural default and precludes federal review unless the prisoner establishes cause to excuse the default and consequent prejudice. *Coleman*, 501 U.S. at 749–50, 111 S. Ct. 2546.

The state asserts that Moore procedurally defaulted his claim that his trial counsel provided ineffective assistance in advising him to waive his right to a jury trial in the Fort case. Moore did not make any argument at all about his jury trial waiver in his direct appeal of that conviction and did not include that ground in his petition for leave to appeal the denial of his postconviction petition to the Illinois Supreme Court. As the state argues, those failures constitute a procedural default that bars habeas review of the claim as it relates to that case (unless Moore could establish cause for the default and prejudice resulting therefrom, or that "a miscarriage of justice would result if habeas relief were foreclosed, which he does not attempt to do).

In response to this procedural default argument (Reply at 24-26), Moore points to the various occasions the state court proceedings when he raised ineffective assistance issues (some relating to his jury trial waiver, some not) but he does not, and cannot, show that he presented any jury trial waiver issue to the state courts for "one full round" of review. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999) ("state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process"). A full round of review is just that; it cannot be assembled after-the-fact from bits and pieces of arguments presented at different stages and levels of review over the course of the entire litigation.

Moore also contends that the state's acknowledgment that "Petitioner has exhausted his state court remedies for the claims he asserts in his § 2254 petition," Resp. at 17, concedes that

he did not procedurally default his ineffective assistance claims in the Fort case. That argument betrays a misunderstanding (understandable in view of the complexity of the procedural requirements of AEDPA) of the exhaustion requirement. To say, as the state does, that petitioner has exhausted his state court remedies simply means that he has no state court remedies available to him. "State remedies are exhausted when the petitioner does not have the "right under the law of the State to raise, by any available procedure, the question presented. 28 U.S.C. § 2254(c). . . . It does not mean that the petitioner necessarily presented all his claims to the state courts and in that regard must be distinguished from procedural default. To avoid procedural default, "a habeas petitioner must fully and fairly present his federal claims to the state courts. Fair presentment requires the petitioner to give the state courts a meaningful opportunity to pass upon the substance of the claims later presented in federal court." *Anderson v. Benik*, 471 F.3d 811, 814 (7th Cir. 2006). "To be sure, the fact that a prisoner has failed to invoke an available state procedure may provide the basis for a conclusion that he has waived a claim. But the exhaustion inquiry focuses entirely on the availability of state procedures at the time when the federal court is asked to entertain a habeas petition." *Boerckel*, 526 U.S. at 852–53 (Stevens, J., dissenting). "A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him." *Coleman*, 501 U.S. at 732.

Because Moore did not present his jury waiver claim in the Fort case to the state courts for one full round of review, that claim is procedurally barred.[26] The state does not, however,

---

[26] In concluding that Moore procedurally defaulted his jury waiver ineffective assistance claims in the Fort case, the Court has considered the fact that, on post-conviction review, the Illinois courts did not deem Moore to have procedurally defaulted that claim as to the Fort trial, but rather treated the matter as a single issue applicable to both cases and held that *res judicata* barred the claim as to **both** cases because the jury waiver issue had been reviewed on direct

argue that the jury waiver ineffective assistance claim Moore advanced in the Williams case is procedurally barred and addressed the merits of that claim.

### 2.    *Strategic jury trial waiver*

In the second round of his direct appeal in the Williams case, Moore complained generally that Carey rendered ineffective assistance by assuring Moore that the judge would not impose the death penalty if Moore waived his jury rights at trial and sentencing. Moore asserted "that the sole reason he waived his right to a jury trial and jury sentencing in his two pending murder cases was Mr. Carey's assurance that if he did so, the judge would not impose the death penalty." Ex. L. at 18. He maintained that it was professionally unreasonable for Carey to offer such an assurance and that, "[a]s a result, Mr. Moore's jury trial waivers in both cases were the unknowing and unintelligent products of his trial lawyer's ineffectiveness." *Id.*[27]

---

appeal in the Williams case. 2014 IL App (1st) 123480-U at ¶ 100 ("Thus, on direct appeal in [the Williams case], the appellate court addressed defendant's claims … that his trial counsel erroneously recommended that he waive jury trials *in both cases*…. Accordingly, defendant's claims in his amended postconviction petition of ineffectiveness of trial counsel are barred by *res judicata*.") (emphasis added). This does not, however, mean that the state's procedural default claim fails as to the jury waiver in the Fort case, because Moore did not include the jury waiver issue at all in his petition for leave to appeal the denial of his post-conviction petition to the Illinois Supreme Court, thereby depriving the state of one full round of post-conviction review of the jury waiver issue as it pertains to the Fort case.

[27] Moore also argued that Carey's assurance constituted ineffective assistance because the advice turned out to be wrong. As stated in Moore's appellate brief in the Williams case (Appellant's Brief, Ex. L, at 20, ECF20-2 at 256 (emphasis added)):

> Mr. Moore did not become aware of the erroneous nature of Carey's assurance until long after [the Williams trial] was over. It was only after the Kimberley Fort trial was completed and the joint capital sentencing hearing had been held, that the trial court imposed a sentence of death. ***Prior to that time, Mr. Moore had no reason to complain about Carey's assertion that if he waived his right to jury trials and jury sentencing hearings, the trial judge would not impose a death sentence***.

The state responded by arguing that a lawyer's advice to waive jury rights constitutes a matter of trial strategy that is not ineffective even if the waiver strategy does not succeed. Appellee's Brief, Ex. L, at 21, ECF 20-2 at 311. The state appellate court, in turn, premised its ruling on the same ground, holding that "Counsel's advice to waive a jury trial is the type of trial tactics and strategy that does not support a claim of ineffective assistance of counsel." Ex. B at 11, ECF 20-1 at 14.[28] As the state maintains, the state appellate court's determination that Carey did not provide ineffective assistance to Moore in advising him to waive his jury rights was not objectively unreasonable.

Claims of ineffective assistance of counsel are, of course, governed by the framework set forth in *Strickland v. Washington*:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687.[29]

---

[28] Because the state courts' *res judicata* rulings as to Moore's assertion of this claim in his post-conviction ruling was based on the appellate court's ruling in the second direct appeal of Moore's conviction in the Williams' case, it is to that opinion this Court must look to evaluate the reasonableness of the state's application of the controlling constitutional standard for evaluating ineffective assistance claims as set forth in *Strickland*. *See Snow*, 880 F.3d at 865 (look through *res judicata* rulings to "the last court to review the merits of the claims").

[29] The state appellate court did not cite *Strickland* as the controlling standard for evaluating Moore's ineffective assistance claim regarding the jury trial waivers, but there is no requirement that it have done so. A "state court need not even be aware of" Supreme Court

Under the performance prong of *Strickland*, a defendant must show that his counsel's representation fell below an objective standard of reasonableness. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690). "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. To avoid the distorting effects of hindsight, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. Review under the performance prong of *Strickland* is "doubly deferential": it requires deference to both trial counsel's professional judgment and to the state court's assessment of that judgment. *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003).

Based on the testimony of Philip Coffey, Carey's co-counsel, at the *Krankel* hearing, the state appellate court rejected Moore's claim, concluding that trial counsel's advice to waive trial by jury was a reasonable exercise of trial strategy. Coffey testified that he and Carey advised Moore "it was our professional opinion that we would do better if we presented the case to your Honor as opposed to a jury for all sorts of reasons," Tr. 12-10-03 at I-11, ECF No. 1 at 111, among them that he and Carey believed that the brutal facts of the cases—which included evidence that Moore had pulled the trigger three times while pointing a gun inches from Melanie Williams' face and chasing down Kimberly Fort and dragging her along the street while she

---

precedents so long its reasoning and result do not contradict them. *See Mitchell v. Esparza*, 540 U.S. 12, 16 (2003). Although the state appellate court did not cite *Strickland,* its ruling was premised on the rule, set forth in *Strickland* itself, that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690. As such, the appellate court employed the correct standard; the only question is whether its application of that standard was unreasonable.

begged for mercy before shooting her in the back with a shotgun from close range—would have a greater and more prejudicial effect on jurors than they would on a seasoned trial judge accustomed to presiding over trials of defendants accused of violent crimes and that the judge would be less likely to impose the death penalty.

The state appellate court's conclusion that the advice of Moore's attorneys to waive a jury trial was a permissible strategic choice was not an unreasonable application of *Strickland*. Although a defendant "has the ultimate authority to make certain fundamental decisions," like whether to waive a jury trial, *Jones v. Barnes*, 463 U.S. 745, 751 (1983), that does not mean that counsel is ineffective for giving advice on whether to proceed with a bench trial, and that is true even where counsel's strategic reasons for waiving a jury trial do not pan out. *Lafler v. Cooper*, 566 U.S. 156, 174 (2012) ("an erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance."). The Seventh Circuit has previously held that an attorney's advice to waive jury trial because the judge was less likely to impose the death penalty than the jury is reasonable and does not constitute deficient performance under *Strickland*. *See Montgomery v. Uchtman*, 426 F.3d 905, 913-14 (7th Cir. 2005); *see also Eddmonds v. Peters*, 93 F.3d 1307, 1317 (7th Cir. 1996) (decision to proceed with bench trial based on belief that judge would not impose the death penalty "was a valid, if ultimately unsuccessful, tactical decision"). Our court of appeals has similarly held advice to waive jury trials as reasonable for other strategic reasons. *See, e.g., Milone v. Camp*, 22 F.3d 693, 705 (7th Cir. 1994) ("counsel's recommendation to waive a jury trial was a reasonable trial strategy" due to concern that jurors would not understand expert testimony); *Ganaway v. United States*, 69 F.3d 539, 1995 WL 623828 *2 (7th Cir.) (affirming denial of ineffective assistance claim premised on advice to

waive right to jury trial where evidence might taint jury's evaluation).[30] *See also United States v. Johnson*, 306 Fed. App'x 305, 307 (7th Cir. 2009) (noting defense counsel's agreement with client that tactical advantages of bench trial included avoiding concerns about the lower educational level of a jury).

Moore argues, however, that although avoiding a death-qualified jury at sentencing provides a valid strategic reason to advise a client to waive the right to a jury at a ***sentencing*** hearing in a capital case, it does not provide any reason to waive the right to a jury at ***trial*** because under Illinois law, defendants have the right to prohibit death penalty questioning of prospective jurors by waiving jury sentencing before trial.[31] "[W]here a pretrial waiver of the sentencing jury is tendered and the court ascertains that it is voluntary and knowing, it must be accepted." *People v. Erickson*, 117 Ill. 2d 271, 288, 513 N.E.2d 367, 374 (1987). And once a capital defendant enters a pre-trial sentencing jury waiver, there no longer exists any reason to "death qualify" or "Witherspoon" the prospective jurors. *People v. Kidd*, 147 Ill.2d 510, 547 (1992) ("There is no justification for death-qualifying a jury which has nothing to do with sentencing.").

---

[30] Other circuits take the same view. *See, e.g., United States v. Hardridge*, 285 Fed. App'x 511, 516 (10th Cir. 2008) (no ineffective assistance for advising to waive jury right due to presentation of technical legal defense); *Willis v. Smith*, 351 F.3d 741, 746 (6th Cir. 2003) (counsel not deficient for recommending bench trial despite judge's prior comments based on evidence heard in earlier related trial); *United States v. Ortiz Oliveras*, 717 F.2d 1, 4 (1st Cir. 1983) (no ineffective assistance where jury waiver could reasonably have been premised, among other reasons, on a belief that "the judge would be more sympathetic in sentencing after a bench trial"); *Wyatt v. United States*, 591 F.2d 260, 267 (4th Cir. 1979) ("the record show[ed] . . . a considered judgment by counsel in choosing a bench rather than jury trial," and the fact that "the decision may . . . have involved tactical error . . . is of no moment to our inquiry").

[31] Moore's dependence on state law for this argument does not render it non-cognizable. "It is well established that a defense attorney's failure to raise a state-law issue can constitute ineffectiveness. The constitutional right to counsel, and its derivative right that counsel be at least minimally effective, is unrelated to the source—whether state or federal—of the defendant's defenses." *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013) (internal quotation marks and punctuation omitted).

Whatever its merit as a matter of state law, Moore places too much weight on an argument that, at best, nullifies only a single reason that might justify advice to waive a jury trial in favor of a bench trial. Even assuming that *Kidd* renders Carey's concern about avoiding a death-qualified unwarranted, there are many other reasons that attorneys may advise clients to waive jury trial. And indeed, Carey's co-counsel, Phil Coffey, testified at the *Krankel* hearing that there were "lots of reasons" that he and Carey believed it was in Moore's interest to waiver his jury rights. These included not only the concern about a death-qualified jury, but also concerns that Carey and Coffey shared about the brutal and chilling nature of the evidence that would be presented at trial. And as the cases cited above confirm, there are many other reasons that can reasonably animate advice to waive the right to a jury trial that have led courts, including the Seventh Circuit, repeatedly to recognize that the advice to waive jury trials falls within the zone of trial tactics and strategy and do not support a claim for ineffective assistance of counsel.

It does not matter, moreover, whether Moore's counsel were actually motivated by any of these reasons because *Strickland*'s performance prong requires an objective inquiry. The focus is not on what reasons subjectively animated Carey's advice to Moore to waive his jury trial rights, but whether, given the relevant facts and circumstances applicable to Moore's situation, whether no competent counsel would have advised him to take a bench trial. *Harrington v. Richter*, 562 U.S. 86, 109–10 (2011) ("The Court of Appeals erred in dismissing strategic considerations like these as an inaccurate account of counsel's actual thinking.... *Strickland* … calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind."). And because there are many reasons for waiving a jury trial in a capital case beyond

avoiding a death-qualified jury—including, but not limited to, concern about the brutal nature of the killings for which Moore was charged—Moore cannot make that showing.

Moore has not, then, demonstrated that in offering his professional opinion to Moore that he "would do better" with a bench trial than a jury trial, Carey was plainly unreasonable.[32]

### 3. Moore's claim that Carey "tricked" him

Perhaps recognizing that, as first presented to the state court on direct appeal of his conviction in the Williams case, his ineffective assistance claim was wanting, Moore's petition also relies on a new argument as to why Carey's advice to waive his jury trial rights was constitutionally ineffective. Moore asserts that "trial counsel's true strategy was to trick him into waiving his rights so that he would not demand jury trials in his cases." Petition, ECF No. 1, at 6 (continuation sheet). Moore elaborates on this argument in his Reply brief. He claims that his Carey misled him by falsely representing that he had "a commitment, promise or signal" that the judge would not impose the death penalty if Moore waived his jury rights:

> Defense Counsel never had & never thought they had, any commitment or indication from Judge Egan that he would not impose a death sentence. Nevertheless, **Carey led & knowingly allowed defendant to believe that he had some form of commitment, promise or signal from Judge Egan that if defendant waived a jury for both trials & for sentencing in both cases, he would not be sentenced to death. It was only on the basis of representations by Counsel which affirmatively misled him as to the existence of a commitment, promise or signal from the Court that . . . defendant was persuaded to waive a jury for trials & sentencings**. . . .

---

[32] The Court notes as well that counsel may face ineffective assistance claims for failing to take action to avoid trial before a *Witherspooned* jury. *See, e.g., United States ex rel. Munson, v. McAdory*, 2004 WL 830467, *11 (N.D. Ill. April 14, 2004) (denying habeas claim asserting that petitioner "received ineffective assistance of counsel when his trial attorneys allowed him to be tried by a death-qualified jury").

Reply, ECF No. 24, at 27. As explained below, this argument is unpersuasive on the merits, but before addressing the merits, the Court considers whether Moore has procedurally defaulted this argument as well.

### a)    *Procedural default*

As noted above, a federal court may not review a state prisoner's habeas claim unless the prisoner has exhausted state remedies by fairly presenting the claim to the state courts for one full round of review. Moore, however, did not present his argument that his trial counsel tricked him into waiving his jury trial rights through one full round of state court review. Moore failed to assert it in any state court proceeding until he filed, in April 2011, his amended/consolidated post-conviction petition, some twelve years after the trial concluded. Ex. XX at C200-04, ECF No. 20-37 at 199-203. Moore's appeal of the denial of his post-conviction petition arguably included this argument (*see* Ex. O at 39-42, which presents a watered-down version of the argument and never expressly claims that Carey represented that he had a deal with the judge), but his PLA to the Illinois Supreme Court after the appellate court affirmed denial of the post-conviction petition inarguably did not present any claim of ineffective assistance premised on Moore's jury trial waivers. Ex. J, ECF No. 20-2 at 81. One full round of state court review includes presentation of the claim in a petition for leave to appeal to the Illinois Supreme Court. *Boerckel*, 526 U.S. at 845.

By failing to present through one full round of state court review his argument that his trial counsel tricked him into waiving jury trials, Moore procedurally defaulted that argument. *See, e.g., Snow v. Pfister*, 880 F.3d 857, 865 (7th Cir. 2018) (new arguments as to how counsel fell short in their efforts to impeach witnesses were procedurally defaulted where petitioner "did not specifically allege" those deficiencies in his petition for leave to appeal in the state court);

*Blackmon v. Williams*, 823 F.3d 1088, 1100 (7th Cir. 2016) (failure to present specific factual bases for ineffective assistance claims constitute procedural default of those claims); *Boatman v. Sternes,* 105 Fed. App'x 66, 67 (7th Cir. 2004) (affirming denial of habeas petition based on procedural default where petitioner failed to present claim that attorney promised that petitioner would be acquitted or convicted of a lesser charge by judge if he waived right to jury trial).[33]

The state, however, has not argued that Moore procedurally defaulted these claims. "The procedural default doctrine is an affirmative defense that the State is obligated to raise and preserve, and consequently one that it can waive." *McGhee v. Dittmann*, 794 F.3d 761, 769 n.16 (7th Cir. 2015) (internal quotation and citation omitted). The Seventh Circuit has indicated that a procedural default defense may be waived by conduct, such as arguing procedural waiver as to some claims but not others. *See Eichwedel v. Chandler*, 696 F.3d 660, 669 (7th Cir. 2012). That is what the state has done here; although the state's response brief never expressly waives a procedural default defense as to any jury waiver ineffective assistance claim in the Williams case, it argues procedural fault of that claim in connection with the Fort case.

There is, however, a substantial argument to be made that the state should not be deemed to have waived this procedural default defense. In *Eichwedel*, the Seventh Circuit also acknowledged that 28 U.S.C. § 2254(b)(3) provides that "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance on the requirement unless the

---

[33] The Court has considered whether there could be cause for Moore's procedural default. Constitutionally ineffective assistance of counsel can excuse a procedural default. Moore might have asserted in his post-conviction petition that his counsel on direct appeal was ineffective for failing to present this argument, but he did not do so. He cannot claim that his post-conviction counsel was ineffective because he filed his PLA *pro se* and has no constitutional right to effective post-conviction counsel in any event. 28 U.S.C. § 2254(i); *Oaks v. Pfister*, 863 F.3d 723, 726 (7th Cir. 2017) ("Constitutionally ineffective assistance of counsel can excuse a procedural default. But because 'a prisoner does not have a constitutional right to counsel in state post-conviction proceedings, ineffective assistance in those proceedings does not qualify as cause to excuse a procedural default.'") (quoting *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017)).

State, through counsel, expressly waives the requirement." *Id.* at 670. Observing that "[s]ome courts have construed section 2254(b)(3)'s express-waiver requirement to apply to procedural default defenses arising from the petitioner's failure to properly exhaust his remedies in state court while those remedies remained open to him," *id.,* the court of appeals expressly declined to take a position on the question because doing so was unnecessary to the disposition of the case.[34]

This Court follows suit. Although the Court has discretion to address the question,[35] in failing to raise the issue the state has denied Moore an opportunity to respond to the procedural default argument. Were the Court to take on the issue, it would be forced either to give the parties the opportunity to submit supplemental briefs on the question or to forge ahead without the benefit of the parties' views. Given the additional delay that more briefing would entail, and the fact that the Court's view of the merits makes the procedural default moot, the Court will forgo a unilateral attempt to resolve an issue that neither party has addressed.

### b) Merits

Moore's argument that Carey "tricked" him into waiving his jury trial rights fails on the merits because he fails to provide any support for the evidentiary premise of the claim: that Carey represented that he had a "commitment, promise or signal" that the judge would not

---

[34] On several other occasions, the Seventh Circuit has similarly noted, without addressing, the open question of whether § 2254(b)(3)'s requirement of an express waiver of an exhaustion defense includes waiver of procedural defaults arising from the failure to exhaust state remedies. *See Cheeks v. Gaetz,* 571 F.3d 680, 686 n.1 (7th Cir.2009); *Perruquet v. Briley,* 390 F.3d 505, 515–16 (7th Cir. 2004) (citing cases discussing the issue).

[35] Federal courts are empowered to raise *sua sponte* issues like exhaustion that implicate issues of federalism and comity and which extend beyond the concerns of the parties themselves. *Winfield v. Dorethy,* 871 F.3d 555, 562-63 (7th Cir. 2017). *See also, e.g., Varela v. United States,* 481 F.3d 932, 936 (7th Cir. 2007) ("it is within the district court's discretion to consider the default issue *sua sponte* so long as the government has not manifested, implicitly or explicitly, a decision to forego the argument"); *Lewis v. Sternes,* 390 F.3d 1019, 1029 (7th Cir. 2004) ("The district court acted well within its authority to recognize procedural default arguments not raised in the State's original answer."); *Perruquet,* 390 F.3d at 519 (federal courts have discretion to raise procedural defaults *sua sponte*).

impose the death penalty if Moore waived his jury rights. In making that claim, it is Moore's burden to establish the factual predicate by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Moore does not come close to meeting this burden, for many reasons.

First, as Moore concedes and the death sentence originally imposed in the Fort case attests, no such deal actually existed. And that Carey had no such commitment from the judge makes it quite unlikely that he told Moore that he did. To do so would have invited Moore to complain about Carey's misrepresentation (or what would have amounted to the judge's reneging on the deal) as soon as the judge entered the order imposing the death penalty. Having been told that the judge had promised not to impose the death penalty, Moore almost certainly would have reacted when the judge pronounced his death sentence, stating: "Mr. Moore will be sentenced to the death for the murder of Kimberly Fort. And may God have mercy on your soul." Ex. Y, Tr. 4-1-99, at Q-144; ECF No. 20-12 at 145. But he did not do so. Moore did not claim that Carey intimated that he had a "commitment, promise or signal" from the judge *until twelve years after he was sentenced*, when he presented his amended consolidated post-conviction petition in 2011. And as a review of Moore's statements and claims about Carey's advice demonstrates, they were not consistent with a claim that Carey misled him about having a deal with the judge.

During the trial court's brief initial colloquy as to waiver of jury trial (Ex. T, Tr. 3-22-99 at J-3) Moore merely said he understood that he had jury rights and was giving them up at both trial and sentencing; he did not say anything about a promise by Carey, much less the judge, that he would not receive death penalty. Nor did he say anything of that sort when trial judge again inquired about waiver of jury rights in the Fort case, after trial judge had already found him guilty in the Williams case—though to be fair, the judge did not specifically ask Moore any

questions about whether anyone had promised him anything in an effort to convince him to waive his jury rights. Ex. V, Tr. 3-26-03 at M-5 – M-6.

More telling than Moore's silence during the waiver colloquies was his allocution before the judge imposed sentence. Moore's brief statements addressed not the question of his guilt (his oblique apology to the victims arguably suggested acknowledgment of his responsibility) but whether he would live to see his children grow up:

> I just want to say that I'm sorry for the—for the pain that might have been caused by these incidents, you know. And I'm sorry to my family that I'm taking all them through all of this and they had to be taken through all of this, you know. *I just want the chance to be able to—you know, to see my kids grow and probably give them advice so that they don't wind up ever in this kind of situation.* I know the family suffered, the families of the victims suffered as well as my family. I'm sorry for it. I don't have anything else to say.

(Ex. Y, Tr. 4-1-99 at Q-134, ECF No. 20-12 at 135 (emphasis added). Moore's statement plainly shows that he understood that the death penalty was in play, and that he faced a possible sentence that would not permit him to see his kids grow up, but if there were any doubt on that score, his statements should be read in context: they followed immediately on the conclusion of a two-day sentencing hearing that began with arguments concerning Moore's eligibility for the death penalty and was capped off by closing arguments of counsel, including his own, that focused solely on whether Moore should receive the death penalty. Moore's claim implies, improbably to say the least, that in view of Carey's assurances about the "commitment, promise, or signal" he had received from the judge, Moore understood these days of testimony and argument about the death penalty to be an elaborate charade.

Moore's silence in the face of actually receiving the death penalty has already been addressed. He was anything but silent, however, when he filed his *pro se* post-trial motion alleging more than a dozen reasons why Carey had rendered ineffective assistance. Filed on June

21, less than three months after sentencing, and before his death sentence had been commuted, Moore's motion stated only that Carey gave "wrong advice" about whether to waive jury rights at trial and sentencing. He said nothing about having been assured that the judge had agreed not to impose the death penalty if he waived his jury rights. Nor, apparently, did Moore advise his counsel on direct appeal, that Carey had misled him concerning the judge's commitment not to impose the death penalty, because no such claim or argument based there on was advanced in his direct appeal; indeed, that filing simply concedes "Mr. Moore waived his right to a jury trial and to a jury capital sentencing hearing in both cases." Ex. K at 3.

Moore's most telling silence, however, was during proceedings on remand after both cases had been sent back to the trial court for a *Krankel* hearing. During those proceedings, the trial judge gave Moore multiple opportunities to elaborate on any of the grounds identified in his pro se post-trial motion (Tr. 11-18-03 at G-5; Tr. 12-10-03 at I-5; Tr. 12-18-03 at 3), yet Moore never claimed that Carey had said anything about a commitment or deal with the judge. Rather, Moore stated only that "Jack Carey stated that if I take a bench and lose, he was sure that the Judge wouldn't sentence me to death." Tr. 11-18-03 at G-13. Further, Phil Coffey testified at the *Krankel* hearing that he and Carey advised Moore to waive jury right because they believed that he "would do better" at a bench trial than at a jury trial, particularly in light of the brutal nature of the crimes. Coffey said nothing to suggest that there was a commitment or deal to waive Moore's jury rights in exchange for a promise not to impose the death penalty. Moore was given the opportunity to question Coffey, yet declined to ask him any questions at all, much less questions about the existence of an agreement with the judge. Tr. 12-10-03 at I-17. Had Carey ever told Moore that the judge had committed not to impose the death penalty, Moore—fortified by the successful appeals that had given him the right to further hearings relating to his claims of

ineffective assistance—would certainly have said so during the *Krankel* proceedings. But he did not. It was anything but unreasonable for the state court to determine on the basis of Coffey's testimony that the "assurance" that Moore alleged Carey to have provided was simply strongly held professional advice.

Nor did Moore make any such claim during his second round of direct appeals after the *Krankel* process concluded. The omission is particularly telling in Moore's appeal in the Williams case. While in the Fort appeal, no ineffective assistance claim was raised as to the jury waiver at all (see Ex. N), in the Williams appeal, Moore did assert that Carey had "assured" him that the judge would not impose the death penalty if he waived his jury rights, but did not claim that Carey had indicated that his certitude was based on a "commitment, promise or signal" the judge had provided. Ex. L at 18. Had Carey actually told Moore that he had a deal with the judge, that fact certainly would have been featured in Moore's appeal. That is particularly so given the fact Moore's appellate counsel cited *People v. Smith*, 326 Ill. App. 3d 831, 761 N.E.2d 306 (1st Dist. 2001) in support of Moore's argument that Carey's "assurance" had constituted ineffective assistance. In *Smith*, it was claimed that an attorney who had advised his client to take a bench trial because the judge owed him a favor and would have information not available to the jury had rendered ineffective assistance; the appellate court held, not surprisingly, that the attorney's advice to take a bench trial because the judge was unethical "would not constitute valid grounds for choosing to waive a jury" and remanded the claim for an evidentiary hearing. *Id.* at 849, 761 N.E.2d at 323. Although Moore's appellate counsel cited the case for legal support, they made no argument that Moore had similarly been advised that the judge would exchange a favorable ruling as a *quid pro quo* for a favor he had been granted by the defense—

not even after the state distinguished Moore's case as not involving similar advice. Appellee's Brief, Ex. L at 29-30, ECF No. 20-2 at 319-320.

Moore did not claim that Carey told him that the judge had made a "commitment" not to impose the death penalty if he waived his jury rights until he filed his Amended Petition for Post-Conviction Relief in April 2011, twelve years after his trials. Ex. XX, ECF No. 20-37 at 153. Moore seeks an evidentiary hearing, presumably on the question of what Carey told him (Moore's motion for an evidentiary hearing does not say this expressly), but as relevant here, under AEDPA, a federal court may not hold an evidentiary hearing unless the petitioner establishes that the "factual predicate of the claim could not have been previously discovered through the exercise of due diligence" and that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. 2254(e)(2)(A)(2). Moore, of course, cannot claim diligence in discovering facts which, if true, he had known about for 12 years, and in any event those facts have nothing to say about his actual guilt or innocence. Moreover, an evidentiary hearing was conducted on the matter in the state court and the prior record of filings in the Williams and Fort cases are properly before the Court. No further evidentiary supplementation is required to address Moore's claim. For all the reasons detailed above, the record makes clear that Moore cannot establish the factual predicate for the "Carey tricked me" argument by clear and convincing evidence. Accordingly, that argument fails on the merits.[36]

*       *       *

---

[36] Because Moore's ineffective assistance claim fails for these multiple reasons, it is not necessary to consider *Strickland*'s prejudice prong.

For the foregoing reasons, the petition for habeas corpus and the motion for an evidentiary hearing are denied. The Court finds that Moore has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), such that reasonable jurists could debate whether Moore's claims should be denied. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Date: March 31, 2018

John J. Tharp, Jr.
United States District Judge